**Joy Bertrand, Esq.**
PO Box 2734
Scottsdale, Arizona 85252-2734
Telephone:  602-374-5321
Fax:  480-361-4694
joyous@mailbag.com
www.joybertrandlaw.com
California State Bar No. 303206

**ATTORNEY FOR:  PLAINTIFF**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

**Rubia Mabel Morales-Alfaro,
individually,**

**Plaintiff,**

**v.**

**U.S. DEPARTMENT OF
HOMELAND SECURITY;
KEVIN MCALEENAN, in his official
capacity as Acting Secretary, U.S.
Department of Homeland Security;
MATTHEW T. ALBENCE, in his
official capacity as Acting Director,
U.S. Immigration and Customs
Enforcement;  DEREK N. BRENNER,
in his official capacity as Deputy
Director, U.S. Immigration and
Customs Enforcement;  TIMOTHY S.
ROBBINS, in his official capacity as
Acting Executive Associate Director,
Enforcement and Removal
Operations;  TAE JOHNSON, in his
official capacity as Assistant Director
of Custody Management, Enforcement
and Removal Operations; STEWART
STEWART D. SMITH, in his official**

Case No. 20-CV-0082

**AMENDED COMPLAINT**

**(Jury Trial Demanded)**

**capacity as Assistant Director, Immigration and Customs Enforcement Health Service Corps; JACKI BECKER KLOPP, in her official capacity as Assistant Director of Operations Support, Enforcement and Removal Operations;  DAVID P. PEKOSKE, in his official capacity as Senior Official Performing Duties of the Deputy Secretary, Department of Homeland Security; and Corrections Corporation of America, Inc.,**

**Defendants.**

Now comes the Plaintiff, Rubia Mabel Morales-Alfaro, to submit her Complaint against the above-named Defendants.  She further submits the following:

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................5

THE PARTIES .......................................................................................6

I. The Plaintiff ......................................................................................6

II. The Defendants ................................................................................6

A. *The DHS Defendants* .....................................................................7

B. *The Corporate Defendant* .............................................................9

JURISDICTION AND VENUE ............................................................10

STATEMENT OF FACTS ....................................................................11

I. Immigration Detention .....................................................................12

A. *DHS' Intent Behind Immigrant Detention* ...................................12

B. *DHS' Deliberate Decision to Detain Pregnant Women* ................13

II. ICE Rules Regarding Pregnant Detainees ......................................16

III. CoreCivic's Known History of Choosing Profit Over
Prisoners' Well Being. ........................................................................17

IV. Documented Conditions at the Otay-Mesa Immigration Facility .........24

V. The State of California's Findings Regarding Conditions at
ICE Detention Centers. .......................................................................26

VI. Ms. Morales-Alfaro Lands in the Clutches of ICE and CoreCivic. .........27

A. *Ms. Morales-Alfaro's Prenatal Diet (or Lack Thereof) While Detained.* ...........28

B. *Ms. Morales-Alfaro's Symptoms of Fetal Distress and Miscarriage
After Waiting Nearly Two Weeks for Medical Care.* ...............................31

PLAINTIFF'S CAUSES OF ACTION AGAINST THE DEFENDANTS .........32

Count One -- Violation of Plaintiff's Rights Under the Fifth and Fourteenth Amendments (Deliberate Indifference to Serious Medical Needs)(All Defendants) ........................................................................32

Count Two -- Violations Of The Fifth Amendment (Punitive Civil Detention Conditions)(All Defendants) .................................................33

Count Three – Negligence (Defendant Corecivic) ....................................34

Count Four -- Gross Negligence (Defendant Corecivic)..........................34

Count Five -- Negligence *Per Se* (Defendant Corecivic) .........................36

Count Six Negligent Infliction Of Emotional Distress (Defendant Corecivic) .................................................................................36

Count Seven -- Negligent Supervision and Training of Employees (Defendant Core Civic).............................................................................37

Count Eight – *Respondeat Superior* Liability (Defendant Corecivic) ........................37

Count Nine -- Count Nine Breach Of Contract (Defendant Corecivic) .................................................................................38

PLAINTIFF'S DAMAGES AND PRAYER FOR RELIEF ...................................... 39

# INTRODUCTION

1.      If the United States chooses to detain asylum seekers – and it is a deliberate choice – then we must ensure that detained asylum seekers receive prompt, effective, medical care.  We also must also protect the constitutional rights of the asylum seekers we entrust to any private contractor.  Those constitutional rights include the right to sleep, to basic hygiene, and timely medical care.  We must also ensure that the conditions maintained by any contractor it hires to house detained asylum seekers are not punitive.

2.      The Defendants failed Rubia Mabel Morales-Alfaro, an asylum seeker from El Salvador, in all respects.  As shown, *infra*, the conditions at the Otay-Mesa ICE Detention Center are deliberately punitive.  CoreCivic – and, in particular, the Otay-Mesa facility is managing -- has a pattern and practice of delaying and avoiding medical care for serious medical conditions, such as a pregnancy in distress.  The facility feeds the asylum seekers nutritionless, inedible food.  The facility denies them sleep, with cold temperatures and no blankets.  As of a result of these conditions, Ms. Morales-Alfaro miscarried on or about January 15, 2018.

# THE PARTIES

## I.    The Plaintiff

3.    The Plaintiff, Rubia Mabel Morales-Alfaro, is a Hispanic female, who presently resides in Fort Smith, Arkansas.

4.    Between December 25, 2017 and March 1, 2018, Ms. Morales-Alfaro was detained as an asylum seeker from El Salvador, having entered the United States at the United States-Mexico border south of San Diego, California.

5.    During her civil immigration detention, she was held at the Otay-Mesa, California ICE detention center, operated by CoreCivic.

6.    Plaintiff was released from detention in August of 2017 and has sued within sufficient time to cover each and every incident of her detention.

7.    Ms. Morales-Alfaro currently resides in the United States on an immigration bond, while her asylum claim is pending.

## II.    The Defendants

8.    The Defendants are comprised of several Department of Homeland Security (hereinafter "DHS") and Immigration and Customs Enforcement (hereinafter 'ICE") officials and a private corporation that contracts with DHS to run immigrant detention centers.

9.    Unless their conduct is being discussed individually, the DHS and ICE officials are referred to in this Complaint as the "DHS Defendants" or "DHS."

For claims that are governed by the Federal Tort Claims Act (FTCA), the Plaintiff has filed an FTCA claim contemporaneously with the filing of this lawsuit.  A copy of that FTCA submission is attached as an Exhibit to the original Complaint in this matter (ECF Doc. 1-2) and its allegations are incorporated by reference.  If the United States chooses not to resolve those claims short of litigation, she will amend this Complaint to include those claims.

10.    The corporate defendant is CoreCivic, Inc., a for-profit corporation that provides detention facility management services to DHS.

*A.    The DHS Defendants*

11.    DHS is an executive branch agency of the United States Government. Defendant Kevin McAleenan is the Acting Secretary of DHS, charged with enforcing and administering federal immigration laws.  He oversees each of the agencies within DHS, including ICE.  He has ultimate authority over all policies, procedures, and practices as applied to ICE Detention Facilities. Defendant McAleenan is sued in his official capacity.

12.    Defendant Matthew T. Albence is the Acting Director of ICE, charged with enforcing federal immigration laws by detaining and removing noncitizens.  He is charged with oversight and monitoring of all policies, procedures, and practices as applied to ICE Detention Facilities.  Defendant Albence is sued in his official capacity.

13.     Defendant Derek N. Benner is the Deputy Director of ICE. In this capacity, Benner executes oversight of ICE's day-to-day operations and oversees a workforce of more than 20,000 employees assigned to more than 400 domestic and international offices.  Defendant Benner is sued in his official capacity.

14.     Defendant Timothy S. Robbins is the Acting Executive Associate Director of Enforcement and Removal Operations ("ERO").  ERO enforces the nation's immigration laws, identifies and apprehends removable noncitizens, and detains and removes these individuals from the United States when necessary. In this capacity, Robbins manages 24 field offices nationwide.  Defendant Robbins is sued in his official capacity.

15.     Defendant Tae Johnson is the Assistant Director of Custody Management, ERO. Johnson is responsible for policy and oversight of the administrative custody of detained immigrants.  In this capacity, Johnson oversees and monitors detention operations, including those at local and state facilities operating under an Intergovernmental Service Agreement ("IGSA"), contract Detention Facilities, ICE-owned facilities, and facilities operated by the Bureau of Prisons ("BOP").  Defendant Johnson is sued in his official capacity.

16.     Defendant Dr. Stewart D. Smith is the Assistant Director for ICE Health Service Corps, which provides medical, dental, and mental healthcare services at facilities nationwide and manages off-site medical care for detained

individuals housed in 240 additional IGSA facilities.  Smith oversees, monitors, and is charged with ensuring adequate healthcare for all ICE detainees nationwide.  Defendant Smith is sued in his official capacity.

17.     Defendant Jacki Becker Klopp is the Assistant Director of Operation support, ERO.  In this capacity, Klopp is responsible for formulation and execution of the overall budget of ICE detention, financial management, facilities management, and hiring and human resources management.  Klopp also provides planning and oversight of ERO facilities and construction. Defendant Klopp is sued in her official capacity.

18.     Defendant David P. Pekoske is the Senior Official Performing the Duties of the Deputy Secretary of DHS.  Upon information and belief, until the Deputy Secretary position is filled, Defendant Pekoske is the senior official charged with overseeing the day-to-day operations of DHS.  Defendant Pekoske is sued in his official capacity.

19.     The Department of Homeland Security is headquartered in Washington, District of Columbia.

*B.*     *The Corporate Defendant.*

20.      Defendant CoreCivic, Inc., is a Maryland corporation with its principal place of business at 10 Burton Hills Blvd, Nashville, Tennessee 37125.

## JURISDICTION AND VENUE

21.     This Court has original jurisdiction over this matter pursuant to 28 USC § 1331, because her claims arise under the Constitution, laws, or treaties of the United States.  (See Counts One and Two)  This Court also has diversity jurisdiction over this matter, pursuant to 28 U.S.C. § 1332, because Ms. Morales-Alfaro lives in Arkansas;  DHS is headquartered in Washington, District of Columbia;  and CoreCivic is a Maryland corporation headquartered in Tennessee.  The value of her claims, described *infra*, exceed $75,000.  (See Counts Three and Seven)  For state law tort claims raised in this Complaint, Ms. Morales-Alfaro relies upon the law of the jurisdiction in which her injury occurred – California.

23.     Ms. Morales-Alfaro seeks declaratory and/or injunctive relief, compensatory and punitive damages, attorney fees and costs, and such other relief that may be available to her.

24.     This Court has authority to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, and Rule 57 of the Federal Rules of Civil Procedure.

25.     This Court has authority to grant injunctive relief in this action pursuant to 5 U.S.C. §§ 702, 706 and Rule 65 of the Federal Rules of Civil Procedure.

26.     This Court has personal jurisdiction over the Defendants in this matter and the underlying acts of this complaint took place in the Southern District of California.

27.     Venue in this district is proper under 42 U.S.C. § 1391, because, as described below, a substantial part of the acts or omissions giving rise to Ms. Moraels-Alfaro's claims occurred in the Southern District of California.

## STATEMENT OF FACTS

28.     Immigration proceedings are civil matters, and immigration detention is likewise civil and therefore should be "nonpunitive" in nature.[1]

29.     Ms. Morals-Alfaro was not detained pursuant to criminal charges or convictions, so the conditions in which she was held must reflect that distinct custody status and must not be similar to, or worse than, the conditions of confinement in jails and prisons.

30.     The treatment of Ms. Morales-Alfaro was worse than the United States is allowed to treat convicted criminals.

---

[1]  *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).

## I.   Immigration Detention.

*A.   DHS' Intent Behind ICE Detention.*

31.   Since at least 2014, ICE's detention policies have deliberatively shifted to become punitive in nature.

32.   Then-DHS Secretary Jeh Johnson described detention and removal as key parts of the Obama Administration's "*aggressive deterrence strategy* focused on the removal and repatriation of recent border crossers" (emphasis added).[2]

33.   The conditions in ICE detention centers are deliberately designed to be punitive and to mirror prisons

34.   In fact, when the core standards governing detention in federal facilities were promulgated in January 2000, the U.S. Department of Justice allowed the core standards for immigration detention facilities to be the same as those governing the U.S. Bureau of Prisons.[3]

[2]  Jeh Johnson, "Statement Before the Senate Committee on Appropriations," July 10, 2014, available at https://www.dhs.gov/news/2014/07/10/statement-secretary-homeland-security-jeh-johnson-senate-committee-appropriations (last visited January 10, 2020).
[3]  Office of the Federal Detention Trustee, *Detention Standards & Compliance Division: History of the Federal Performance-Based Detention Standards,* https://www.justice.gov/archive/ofdt/qap-brochure.pdf.

35.     Likewise, ICE's current national standards governing immigration prisons were promulgated in cooperation with the American Correctional Association ("ACA").[4]

36.     Defendants evade their reporting responsibilities by interpreting Congress's mandate to complete reports on an "in-custody death" not to include deaths in which a detained person is transferred to a hospital to die.[5]

37.     Those few times when ICE makes adverse findings regarding conditions in Detention Facilities, they typically do not result in any consequences for its contractors.  A January 2019 OIG report found numerous deficiencies in ICE's contract enforcement mechanisms.[6]

38.     The DHS defendants' history of manipulating in-custody death data, combined with its repeated enforcement failures raises an inference of deliberate conduct, as opposed to incompetence.

B.     *DHS' Deliberate Decision to Detain Pregnant Women*.

[4] *Facility Inspections*, ICE, https://www.ice.gov/facility-inspections.
[5] *A Trans Asylum Seeker Dies After Pleading to ICE for Medical Care*, The Nation (June 4, 2019), https://www.thenation.com/article/ice-otero-joa-transgender-death/.
[6] Office of Inspector Gen., U.S. Dep't of Homeland Sec., *OIG-19-18*, *supra* note 45, at 15.

39.     Federal regulations give ICE the authority to parole asylum seekers who have presented themselves at a port of entry into the U.S. during the pendency of their asylum hearings.[7]

40.     In fact, these regulations 8 C.F.R. § 212.5(b)(1) specifically authorize ICE to release pregnant women.[8]

41.     ICE policy directives also authorize parole for those asylum seekers who have passed the "Credible Fear Interview," a mechanism by which DHS filters out non-meritorious asylum claims.

42.     ICE Detained nearly 68,000 women in FY 2017.[9]

43.     Since the 2016 election, the number of pregnant women held in ICE detention has increased 52%, from 1,377 in 2016 to 2,094 in 2018.[10]

[7] 8 C.F.R. § 212.5
[8] 8 C.F.R. § 212.5(b)(2).
[9] Letter from Members of Congress to The Honorable Elaine Duke, Acting Secretary of Homeland Security, October 31, 2017, available at https://jayapal.house.gov/sites/jayapal.house.gov/files/documents/WWG%20Letter%20on%20Pregnant%20Women%20in%20ICE%20Custody%202017_10_31.pdf (last visited February 27, 2018), citing Complaint: US Immigrations and Customs Enforcement's Detention and Treatment of Pregnant Women (Filed September 26, 2017), available at https://www.aclu.org/legal-document/pregnant-women-ice-custody-complaint-dhs-office-civil-rights-and-civil-liberties-and. (last visited February 27, 2018).
[10] Government Accountability Office, "Report to the Chairwoman Subcommittee on Immigration and Citizenship, Committee on the Judiciary, House of Representatives: Immigration Enforcement: Arrests, Detentions, Removals, and Issues Related to Selected Populations," December 5, 2019.

44.     Between October 1, 2017 and August 31, 2018, ICE held in detention 1,655 pregnant women.[11]

45.     Between 2012 and 2014, ICE held 559 pregnant women in detention.[12]

46.     This sharp increase in the number of pregnant women detained by ICE is the result of ICE's 2018 deliberate policy decision to end the presumptive release of pregnant women, to "better align with the President's Executive Order (EO) 13768 *Enhancing Public Safety in the Interior of the United States.*"[13]

47.     None of the ICE detention facilities' medical units are equipped to provide the specialized care needed by pregnant women; the women are taken outside the detention center for their routine medical visits.[14]

---

" at 58, available at https://context-cdn.washingtonpost.com/notes/prod/default/documents/fd42c373-ec7d-4257-823d-bf79fa9be66e/note/84690b38-8596-4686-af94-e51234f095b4.pdf

[11] *Id.*

[12] Letters from Members of Congress, supra note 10.

[13] U.S. Immigration and Customs Enforcement, "FAQs: Identification and Monitoring of Pregnant Detainees," available at https://www.ice.gov/faqs-identification-and-monitoring-pregnant-detainees#wcm-survey-target-id (last visited January 10, 2020); see also, U.S. Immigration and Customs Enforcement Directive 11032.3, "Identification and Monitoring of Pregnant Detainees," December 14, 2017, available at https://www.ice.gov/sites/default/files/documents/Document/2018/11032_3_PregnantDetaines.pdf (last visited January 10, 2020).

[14] Robyn Barnard, et al., "Prisons and Punishment: Immigration Detention in California," Human Rights First, January 2019 Report, at 12, available at https://www.humanrightsfirst.org/sites/default/files/Prisons_and_Punishment.pdf (last visited January 8, 2020).

48.     There were at least 28 miscarriages in immigration custody in FY 2017.[15]

49.     Also underscoring the DHS Defendants' deliberate evasion from public accountability, DHS does not include stillborn babies in its accounting of miscarriages in ICE custody.[16]

**II.      ICE Rules Regarding Pregnant Detainees**

50.     In 2016, ICE issued a policy advising against the detention of pregnant women, with the rationale that incarceration creates serious health risks for expectant mothers, and detention facilities are not equipped to serve those unique needs.

51.     In December 2017, Thomas Homan, the acting director of ICE, announced that the agency would change that directive to comply with President Trump's executive order  on immigration and eliminate the presumption of release for pregnant women.

52.     ICE requires contractors to adhere to the most current ICE-issued detention standards, the Performance-Based National Detention Standards (PBNDS), last issued in 2011.

---

[15] *Id.*

[16] U.S. Immigration and Customs Enforcement, "News Release from CBP and ICE on Stillbirth in Custody," February 25, 2019available at https://www.ice.gov/news/releases/joint-statement-ice-and-cbp-stillbirth-custody (last visited June 3, 2019).

53.     The standards require, "A pregnant detainee in custody shall have access to pregnancy services including routine or specialized prenatal care, pregnancy testing, comprehensive counseling and assistance, postpartum follow up, lactation services and abortion services."[17]

54.     Those standards also require, in part, **"If a pregnant detainee has been identified as high risk, the detainee shall be referred, as appropriate, to a physician specializing in high risk pregnancies."**[18]

55.     ICE policies further provide:

> A pregnant woman or women in post-delivery recuperation shall not be restrained absent truly extraordinary circumstances that render restraints absolutely necessary as documented by a supervisor or directed by the on- site medical authority. This general prohibition on restraints applies to all pregnant women in the custody of ICE, whether during transport, in a detention facility, or at an outside medical facility.  Restraints are never permitted on women who are in active labor or delivery.[19]

56.     DHS and its contractor, CoreCivic, followed none of these rules with Ms. Morales-Alfaro's pregnancy.

**III.     CoreCivic's Known History of Choosing Profit over Prisoner Well-Being.**

57.     Nine out of ten of the country's largest immigration detention facilities are operated by private companies like CoreCivic. These facilities hold

---

[17] PBNDS 4.4.II.3.
[18] PBNDS 4.4V.E.
[19] PBNDS 4.4V.E.

approximately two-thirds of the civil immigration detainees in a system that currently keeps more than 31,000 people in custody on a typical day.

58.     CoreCivic operates hundreds of private prisons – to include immigration detention centers -- across the United States.

59.     CoreCivic was created by a group of Tennessee businessmen and generated $1.9 billion in revenue for the 12 months prior to September 2019, according to S&P Global Market Intelligence. CoreCivic's CEO, Damon Hininger, started his career as a corrections officer at Leavenworth Detention Center in Kansas in 1992 and steadily rose through the ranks, becoming CEO in 2009 and earning $4.1 million in total compensation by 2018.[20]

60.     CoreCivic's facilities are used both for incarcerating prisoners, that is, individuals who have been convicted of a crime and for incarcerating civil immigration detainees.

61.     The facilities are dedicated to one or the other. CoreCivic does not mix convicted prisoners with immigration detainees in the same facility.

---

[20] Monsy Alvarado, et al., "These People are Profitable: Private prison companies have detained immigrants for decades, but that business has exploded under President Trump." USA Today, February 16, 2020, available at https://www.usatoday.com/in-depth/news/nation/2019/12/19/ice-detention-private-prisons-expands-under-trump-administration/4393366002/ (last visited February 16, 2020).

62.     These individuals may include refugees who are seeking asylum. Individuals detained at the border are only released only on a case-by-case basis by the authority of the U.S. Bureau of Immigration and Customs Enforcement (ICE).

63.      Nine out of ten of the country's largest immigration detention facilities are operated by private companies like CoreCivic.  These facilities hold approximately two-thirds of the civil immigration detainees in a system that currently keeps more than 31,000 people in custody on a typical day.

64.     The for-profit civil immigration detention business is worth over $3 billion dollars per year.

65.     Companies such as CoreCivic deny engaging in lobbying efforts, but private prison corporations such as CoreCivic routinely specifically target legislators over immigration "reform."

66.     By 2015, CoreCivic derived 51% of its revenue from federal contracts.

67.     In March of 2017, the Trump administration announced that the United States' civil immigration detention capacity would be increased by 20,000 beds (over four-hundred fifty percent (450%)).  This signals increase in immigrant detention is the largest since World War II and from which CoreCivic derives nearly $1 billion a year in revenue.

68.     Between the 2016 Presidential election and February 24, 2017, CoreCivic's stock price surged 140%.[21]

69.     CoreCivic's acts were carried out with intent, malice, oppression, fraud, and duress. CoreCivic acted with complete disregard of the rights and liberty of the detainees, without regard to their dignity or humanity.

70.     CoreCivic's actions are a continuing pattern and course of conduct.  These are not isolated incidents, but constitute an institutional decision to maximize its profits, while exploiting the immigration detainees trusted to their care, while awaiting a decision on immigration status and other matters.

71.     CoreCivic (previously known as CCA) has a lengthy history of refusing to provide adequate medical treatment to those it houses.[22]  CoreCivic has

[21] Heather Long, "Private Prison Stocks Up 100% Since Trump's Win," CNN Money, February 24, 2017, available at https://money.cnn.com/2017/02/24/investing/private-prison-stocks-soar-trump/index.html (last visited January 7, 2020);  Jeff Sommer, "Trump Immigration Crackdown is Great for Private Prison Stocks," New York Times, March 10, 2017, available at https://www.nytimes.com/2017/03/10/your-money/immigrants-prison-stocks.html (last visited January 10, 2020).

[22] *See, e.g., Grae v. Corr. Corp. of Am.*, No. 3:16-CV-2267, 2019 WL 1399600, at  *2 (M.D. Tenn. Mar. 26, 2019) (shareholder class certified alleging CoreCivic's "failure to provide sufficient medical services to its inmates.");  *Dodson v. CoreCivic*, No. 3:17-CV-00048, 2018 WL 4800836, at *1 (M.D. Tenn. Oct. 3, 2018) (alleging deliberate inference to prisoners medical needs);  *Pierce v. D.C.*, 128 F. Supp. 3d 250, 284 (D.D.C. 2015) (finding prisoner's ADA and Section 504 rights violated at CoreCivic facility).

repeatedly been the subject of investigations and lawsuits regarding delayed health care to inmates and detainees, often resulting in death.[23]

72.     April 2017 DHS Office of the Inspector General inspection found that Stewart Detention Center – also run by CoreCivic -- suffered from major staffing issues, prompting one employee to describe the medical care situation as "a ticking time bomb."[24]

[23] Seth Freed Walker, "Federal Officials Ignored Years of Internal Warnings About Deaths at Private Prisons," *The Nation*, June 15, 2016, available at https://www.thenation.com/article/federal-officials-ignored-years-of-internal-warnings-about-deaths-at-private-prisons/ (last visited January 8, 2020). "At least 38 men died in the BOP's privately run prisons from 1998 to 2014 in the wake of inadequate medical care.  An examination of thousands of pages of previously unreleased files revealed that gravely ill prisoners had been left untreated, or relegated to the care of low-level medical workers.  In some facilities, inmates went months without seeing a doctor. Some prisoners who required emergency care were not transferred to a hospital, in an apparent attempt to save costs . . .   In a striking confirmation of these findings, the new records show that BOP monitors documented, between January 2007 and June 2015, the deaths of 34 inmates who were provided substandard medical care. Fourteen of these deaths occurred in prisons run by CCA [the prior corporate name for CoreCivic]."

[24] Office of Inspector General, U.S. Dep't of Homeland Sec., *OIG Freedom of Information Act Request No. 2018-IGFO-00059 Final Response*, at 16 (April 25, 2018), https://www.wabe.org/wp-content/uploads/2018/05/2018-IGFO-00059_Final-Response_watermark-4.pdf; *see also Investigation finds ICE detention center cut corners and skirted federal detention rules*, Public Radio International (March 15, 2018), https://www.pri.org/stories/2018-03-15/investigation-finds-ice-detention-center-cuts-corners-and-skirted-federal; Katherine Hawkins, *Outsourced Oversight*, Project on Government Oversight (March 12, 2019), available at https://www.pogo.org/investigation/2019/03/outsourced-oversight/.

73.     In one lawsuit, in which a pregnant prisoner in Tennessee, Merideth Manning miscarried late in her pregnancy, a former CCA nurse stated under oath, "the facility's medical unit was understaffed and over-worked for the number of prisoners, preventing proper medical care for all of the prisoners . . . The facility often relied on non-medical personnel to make medical decisions for prisoners. . . have worked in nursing and corrections for many years. CCA's continuing mistreatment of prisoners is the worst I have ever witnessed."

74.     Eerily similar to Ms. Morales-Alfaro's case, in Manning's case, CCA staff ignored her pleas when she experienced vaginal bleeding over a three-day period in 2004 while pregnant.

75.     Manning received a $250,000 settlement from CCA, after filing suit in state court.

76.     In 2014, CoreCivic (then CCA) paid a $690,000 Settlement for the death of another prisoner's baby.[25]

---

[25] Derke Gilna, "$690,000 settlement in HRDC Suit Over Death of Prisoner's Baby at CCA Jail," Prison Legal News, June 8, 2015, available at https://www.prisonlegalnews.org/news/2015/jun/8/690000-settlement-hrdc-suit-over-death-prisoners-baby-cca-jail/.

77.    In the 2014 case, the mother went into early labor at five months along. Guards ignored the  nurse's order to take her to emergency room, resulting in a five hour delay in getting mom and baby to hospital.[26]

78.    CCA's excuses in that case ranged from "it was 'count' time" to "other codes were called in the facility."[27]

79.    On information and belief, there are least four other cases of CCA/CoreCivic denying care to pregnant women, resulting in the death of one woman and four babies.

80.    In addition to repeatedly ignoring the serious medical needs of pregnant women in its custody, CoreCivic also profits from providing basic feminine hygiene supplies.

81.    CoreCivic, for example and without limitation, charges money for feminine hygiene products.

82.    Many of the women, like Ms. Morales-Alfaro, do not have the money to purchase sanitary pads and tampons, leaving them to go without these basic supplies.

83.    This practice is not only dehumanizing and humiliating, but it also creates a health hazard that endangers the detainees.

---

[26] *Id*.
[27] *Id*.

## IV.    Documented Conditions at the Otay-Mesa Immigration Facility.

84.    The Otay-Mesa ICE detention center is managed, *via* contract with ICE, by CoreCivic, Inc.

85.    The Otay-Mesa detention facility looks and acts like a prison.  It is ringed by a chain link fences topped with barbed wire and visitation is substantially restricted.[28]

86.    Otay-Mesa CoreCivic correctional officers strictly control movement.

87.    Ms. Morales-Alfaro was denied access to her personal clothing and most possessions.  She was required to wear prison garb.

88.    Ms. Morales-Alfaro and her fellow detainees allowed only a few hours of access to fresh air and sunlight each day.

89.    When transported outside of the CoreCivic facility, corrections officers placed the pregnant Ms. Morales-Alfaro in restraints.

90.    CoreCivic's – and, thus, ICE's – denial of medical care to Ms. Morales-Alfaro exacerbated the punitiveness of her detention.

91.    CoreCivic guards are the gatekeepers to medical care, although they are hardly medical providers.

---

[28]  A photo of the facility fencing is available at:
https://www.freedomforimmigrants.org/otay-mesa-detention-center (last visited January 10, 2020).

92.     The CoreCivic guards decide, based on a detainee's written request, if will see a nurse at all and, if they allow it, when a nurse will see the detainee.

93.     In 2018, a former CoreCivic training officer at Otay-Mesa testified in a wrongful death suit brought by the estate of a former detained individual there that short-staffing hindered officers' ability to notice when detained individuals required medical care and a referral to the medical unit.[29]

94.     The DHS Defendants maintain a policy and practice of systemically failing to monitor and enforce requirements to provide timely access to medical and mental health care.  Across the DHS Defendants' network of detention facilities, detained individuals experience lengthy and dangerous delays, and often outright denials, in receiving medical and mental health care.

95.     To seek care, detained individuals regularly must make repeated, written requests to staff for medical attention—and then wait for days for a response.

96.     Once they do receive a response, it is often days, weeks, or months before they can see medical staff within Detention Facilities.

[29] Samantha Michaels, *Understaffed Federal Prison Is Taking in 1,000 Noncriminal Immigrants, and Even the Guards Are Protesting*, Mother Jones, (June 21 15, 2018) https://www.motherjones.com/crime justice/2018/06/understaffed- federal-prison-is-taking-in-1000-noncriminal-immigrants-and-even-the-guards-are-protesting/.

97.     They are commonly given over-the-counter pain medication as the only

intervention, even if the underlying medical issue—like a looming

miscarriage—requires more serious and immediate treatment.

98.     These brutal conditions stem directly from ICE's centralized policies,

practices, and failures of meaningful oversight.

99.     The risk of harm to detained asylum seekers is substantial, irreparable,

and ongoing.  Dozens have unnecessarily died as a result of insufficient care.

Countless more have endured needless suffering from delays in medical care,

refusals to accommodate disabilities, and nearly constant isolation.  Conditions

in detention are so brutal that many people are forced to abandon viable claims

for immigration relief and accept deportation out of a desperate desire to escape

the torture they are enduring in detention on U.S. soil.

**V.     The State of California's Findings Regarding Conditions at ICE Detention Centers.**

100.    In February 2019, the California Department of Justice published the

findings of its review of all ten ICE detention facilities in California, to include

Otay-Mesa.[30]

---

[30] Leticia Miranda, *Dialing with Dollars: How County Jails Profit From Immigrant Detainees*, The Nation (May 15, 2014), https://www.thenation.com/article/dialing-dollars-how-county-jails-profit-immigrant-detainees/.

101.    Overall, the review found that detained individuals often face highly restrictive and prison-like settings, including wearing prison-style clothing, spending up to 22 hours a day in their cells, facing restrictions on communicating with counsel, receiving inadequate medical and mental health care, and performing work for which they are often unpaid or compensated at $1.00 a day.[31]

**VI.    Ms. Morales-Alfaro Lands in the Clutches of ICE and CoreCivic.**

102.    While travelling from El Salvador to the United States, Ms. Morales-Alfaro learned that she was pregnant.

103.    Ms. Morales-Alfaro presented to the United States Customs and Border Protection officers seeking asylum on or about December 25, 2017.

104.    Ms. Morales-Alfaro initially was housed at an CBP detention facility, which she believes was near the United States-Mexico border.

105.    In that first facility, Ms. Morales-Alfaro was subjected to inhumanely cold temperatures and no medical care.

106.    Her description is consistent with the findings of at least one non-governmental agency, that women and children are often held at these initial

[31]  *Id*. at iii–iv, 78, 122–27.

detention facilities in rooms the DHS employees call "hielaras" – Spanish for "freezers."[32]

107.   After two to three days at the first detention center, Ms. Morales-Alfaro was transferred to the Otay-Mesa ICE detention center.

A.   *Ms. Morales-Alfaro's Prenatal Diet (or Lack Thereof) While Detained*.

108.   The American College of Obstetrics and Gynecology has published the following nutritional guidelines for pregnant women:

[The recommended food groups are]

1.      Grains—Bread, pasta, oatmeal, cereal, and tortillas are all grains.

2.      Fruits—Fruits can be fresh, canned, frozen, or dried. Juice that is 100% fruit juice also counts.

3.      Vegetables—Vegetables can be raw or cooked, frozen, canned, dried, or 100% vegetable juice.

4.      Protein foods—Protein foods include meat, poultry, seafood, beans and peas, eggs, processed soy products, nuts, and seeds.

5.      Dairy—Milk and products made from milk, such as cheese, yogurt, and ice cream, make up the dairy group.

. . .

[32] Human Rights Watch, "In the Freezer: Abusive Conditions for Women and Children in U.S. Immigration Holding Cells," February 28, 2018, available at https://www.hrw.org/report/2018/02/28/freezer/abusive-conditions-women-and-children-us-immigration-holding-cells (last visited January 10, 2020).

During pregnancy, the fats that you eat provide energy and help build many fetal organs and the placenta. Most of the fats and oils in your diet should come from plant sources. Limit solid fats, such as those from animal sources. Solid fats also can be found in processed foods.

. . . .

Vitamins and minerals play important roles in all of your body functions. During pregnancy, you need more folic acid and iron than a woman who is not pregnant.

. . . .

Folic acid, also known as folate, is a B vitamin that is important for pregnant women. Before pregnancy and during pregnancy, you need 400 micrograms of folic acid daily to help prevent major birth defects of the fetal brain and spine called neural tube defects. Current dietary guidelines recommend that pregnant women get at least 600 micrograms of folic acid daily from all sources. It may be hard to get the recommended amount of folic acid from food alone. For this reason, all pregnant women and all women who may become pregnant should take a daily vitamin supplement that contains folic acid.

. . . .

Iron is used by your body to make a substance in red blood cells that carries oxygen to your organs and tissues. During pregnancy, you need extra iron—about double the amount that a nonpregnant woman needs. This extra iron helps your body make more blood to supply oxygen to your fetus. The daily recommended dose of iron during pregnancy is 27 mg, which is found in most prenatal vitamin supplements.  You also can eat iron-rich foods, including lean red meat, poultry, fish, dried beans and peas, iron-fortified cereals, and prune juice. Iron also can be absorbed more easily if iron-rich foods are eaten with vitamin C-rich foods, such as citrus fruits and tomatoes.

. . . .

Calcium is used to build your fetus's bones and teeth.  All women, including pregnant women, aged 19 years and older should get 1,000 mg

of calcium daily; those aged 14–18 years should get 1,300 mg daily.  Milk and other dairy products, such as cheese and yogurt, are the best sources of calcium.  If you have trouble digesting milk products, you can get calcium from other sources, such as broccoli; dark, leafy greens; sardines; or a calcium supplement.

. . . .

Vitamin D works with calcium to help the fetus's bones and teeth develop. It also is essential for healthy skin and eyesight. All women, including those who are pregnant, need 600 international units of vitamin D a day. Good sources are milk fortified with vitamin D and fatty fish such as salmon.  Exposure to sunlight also converts a chemical in the skin to vitamin D.

109.   None of these guidelines were followed by the United States' contractor, CoreCivic.

110.   Ms. Morales and the other detainees, to include the several other pregnant women housed with her, received no fresh fruit and no fresh vegetables.

111.   The food she did receive was nearly inedible and full of starch filler.

112.   The nutritionally deficient – and inedible – food at the CoreCivic's Otay-Mesa Facility also was a contributing factor in Ms. Morales-Alfaro's miscarriage.[33]

---

[33]  See, e.g. Rahimeh Ahmadi, M.Sc., Saeideh Ziaei, M.D., and Sosan Parsay, Ph.D.,"Association between Nutritional Status with Spontaneous Abortion," *International Journal of Fertility and Sterility*, Jan. – Mar. 2017,vol. 10.4, at 337.42, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5134748/ (last visited January 9, 2020).

*B.     Ms. Morales-Alfaro's Symptoms of Fetal Distress and Miscarriage After Waiting Nearly Two Weeks for Medical Care.*

113.    On January 3, 2018, Ms. Morales reported to one of the guards that she was bleeding and pain.

114.    She asked the CoreCivic guard for medical assistance.

115.    The first guard she told in the morning told her she'd have to wait.

116.    She then told another guard on the afternoon shift that she was bleeding and feeling more pain.

117.    That guard also told her to wait.

118.    The next day, the guards allowed Ms. Morales-Alfaro to see the nurse.

119.    The nurse told Ms. Morales-Alfaro that bleeding and pain were "normal" in the first trimester;  on information and belief, that nurse was not licensed to diagnose or treat any aliment or disease.

120.    The nurse sent Ms. Morales-Alfaro back to her pod in the facility with Tylenol.

121.    Despite Ms. Morales telling guards each day for the ensuing two weeks that her bleeding and pain were getting worse, and despite, with those reports to the guards, asking to be allowed to go to medical, the CoreCivic guards refused to allow Ms. Morales-Alfaro to return to medical.

122.     The next time Ms. Morales received any medical care, despite her daily requests, was approximately two weeks later, when, on January 15, 2018, she collapsed and was transported to a hospital.

123.     Between January 15, 2018 and January 16, 2018, Ms. Morales miscarried.

124.     Hospital staff told Ms. Morales-Alfaro that the miscarriage could have been avoided, if she had been seen by a doctor sooner.

125.     Ms. Morales-Alfaro was placed in restraints both at the hospital and during her transport to and from the hospital.

**PLAINTIFF'S CAUSES OF ACTION AGAINST DEFENDANTS**

**COUNT ONE**
**VIOLATION OF PLAINTIFF'S RIGHTS UNDER**
**THE FIFTH AND FOURTEENTH AMENDMENTS**
**(Deliberate Indifference to Serious Medical Needs)**
**(All Defendants)**

126.     Ms. Morales-Alfaro re-alleges paragraphs 1-125, *supra*, as if fully alleged herein.

127.     Defendants, in denying Ms. Morales-Alfaro medical care for more than two weeks, after she began showing symptoms of fetal distress, were deliberately indifferent to the serious risk of substantial harm and injury to her.

128.     Defendants' deliberate indifference to Ms. Morales-Alfaro's serious medical needs are consistent with the Defendants' demonstrated policy and practice of deliberate indifference to the serious medical needs of detained asylum seekers.

129.   Delays and denial of medical and mental health care have been cited repeatedly in government reviews documenting detained individuals' deaths, in the government's own reporting on Defendants' Detention Facility network, and in non-governmental organization reporting.

130.   Despite these reports, Defendants have taken no effective steps to eliminate or mitigate the delays and denial of care.

131.   Their failure to remedy known dangers to detainees created by the Defendants constitutes deliberate indifference to the serious medical needs of immigrants in ICE detention.

132.   Here, the Defendants' deliberate indifference to Ms. Morales-Alfaro's serious medical needs contributed to her miscarriage.

**COUNT TWO**
**VIOLATIONS OF THE FIFTH AMENDMENT**
**(Punitive Civil Detention Conditions)**
**(All Defendants)**

133.   Ms. Morales-Alfaro re-alleges paragraphs 1-132, *supra*, as if fully alleged herein.

134.   If a civil detainee is confined in conditions that are identical to, similar to, or more restrictive than those under which pre-trial detainees or convicted

prisoners are held, then those conditions are presumptively punitive and unconstitutional.[34]

135.   Here, Ms. Morales-Alfaro, and thousands of other detainees have been subject to brutal, punitive conditions, to include, but not be limited to:  strict limits on access to the outdoors and sunshine;  freezing cold holding cells and detainee pods;  the lack of blankets in those freezing temperatures, which prohibits the detainees from sleeping;  the denial of edible food and proper nutrition;  delay and denial of medical care;  and delay and denial of feminine hygiene products;  and shackling pregnant women.

136.   These punishing  conditions constitute violations of the Fifth Amendment and injury, in and of itself, to Ms. Morales-Alfaro.

**COUNT THREE**
**NEGLIGENCE**
**(Defendant CoreCivic)**

137.   Ms. Morales-Alfaro re-alleges paragraphs 1-136, *supra*, as if fully alleged herein.

[34] *King v. Cty. of Los Angeles*, 885 F.3d 548, 552 (9th Cir. 2018) (finding presumption of punitive and unconstitutional treatment where conditions of confinement for civil detainees are similar to those faced by pre-trial criminal detainees);  *Jones v. Blanas,* 393 F.3d 918, 934 (9th Cir. 2004), cert. denied, 1 26 S.Ct. 351 (2005).

138.   Ms. Morales-Alfaro was at the complete mercy of CoreCivic's employees to receive food, clothing, bedding, sanitary supplies, and medical care and access to the outdoors and sunshine.

139.   Throughout her detention at the CoreCivic Otay-Mesa facility, CoreCivic employees, breached their duties to her, by, and without limitation:  requiring her to wear prison garb;  providing her only inedible food;  creating conditions so cold and not providing a blanket, so that she could not sleep;  denying her basic feminine hygiene products;  delaying and denying her access to medical providers;  and denying her access to the outdoors and sunshine.

140.   The repeated breaches of these duties contributed to Ms. Morales-Alfaro's miscarriage.

141.   The repeated breaches of these duties also caused Ms. Morales pain, suffering, and emotional distress.

## COUNT FOUR
## GROSS NEGLIGENCE
### (Defendant CoreCivic)

142.   Ms. Morales-Alfaro re-alleges paragraphs 1-141, *supra*, as if fully alleged herein.

143.   In addition to being plainly negligent, the breaches of duty described in Count Three also constitute gross negligence, because they evidence they

evidence a lack of any care and an extreme departure from what a reasonable person would do in the same situation to prevent harm to oneself or others.

## COUNT FIVE
## NEGLIGENCE *PER SE*
## (Defendant CoreCivic)

144.   Ms. Morales-Alfaro re-alleges paragraphs 1-143, *supra*, as if fully alleged herein.

145.   DHS promulgated standards regarding the treatment of ICE detainees for all ICE detention centers to follow.

146.   Those standards, such as those pertaining to the treatment of pregnant women, were specifically designed to protect the detainees.

145.   In breaching their duties to Ms. Morales-Alfaro, CoreCivic repeatedly violated the specific DHS standards for the treatment of ICE detainees.  The violations of these promulgated standards constitutes negligence *per se*.

## COUNT SIX
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
## (Defendant CoreCivic)

146.   Ms. Morales-Alfaro re-alleges paragraphs 1-146, *supra*, as if fully alleged herein.

147.   The CoreCivic's negligence directly contributed to or was a proximate cause of the miscarriage of Ms. Morales-Alfaro's baby.

148.   This lost pregnancy caused her the kind of suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation, and shame, with which no reasonable person would be able to cope.

**COUNT SEVEN**
**NEGLIGENT SUPERVISION AND TRAINING OF EMPLOYEES**
**(Defendant Core Civic)**

149.   Ms. Morales-Alfaro re-alleges paragraphs 1-148, *supra*, as if fully alleged herein.

150.   The CoreCivic employees' conduct, described *supra*, was the direct and proximate result of CoreCivic's abject failure to properly supervise and train its corrections officers.

151.   CoreCivic knew or should have known that its employees at the Otay-Mesa facility (and its other ICE detention facilities) were repeatedly failing in their duties to detained asylum seekers.

152.   CoreCivic knew or should have known about the scores of DHS Office of Inspector General investigations, Congressional investigations, non-governmental organization investigations, prior lawsuits, and its own internal reviews that conditions in its ICE detention centers were not only substandard, but also barbaric.

153.   CoreCivic's repeated failures to correct these deficiencies makes it liable for the negligent supervision and training of its employees at the Otay-Mesa facility.

## COUNT EIGHT
### *RESPONDEAT SUPERIOR* LIABILITY
### (Defendant CoreCivic)

154.   Ms. Morales-Alfaro re-alleges paragraphs 1-153, *supra*, as if fully alleged herein.

155.   The conduct of CoreCivic employees, described *supra*, occurred at the Otay-Mesa facility, by CoreCivic employees, while they were acting within the ordinary scope of their employment.  As such, CoreCivic is responsible for Mr. Morales-Alfaro's injuries under the *respondeat superior* doctrine.

## COUNT NINE
### BREACH OF CONTRACT
### (Defendant CoreCivic)

156.   Ms. Morales-Alfaro re-alleges paragraphs 1-153, *supra*, as if fully alleged herein.

157.   CoreCivic housed Ms. Morales-Alfaro, pursuant to a contract with ICE worth millions of dollars per year.

158.   Pursuant to that agreement, CoreCivic assumed an obligation to provide detainees adequate medical care, proper sleeping quarters, and proper nutrition.

As such, the ICE-CoreCivic contract was intended to confer a "benefit" on detainees, including the Plaintiff.

159.    CoreCivic failed miserably in honoring its duties under its contract with ICE to Ms. Morales-Alfaro.  It could not even give her a sanitary pad.

160    .CoreCivic's failure to honor its contractual obligations, as they pertained to Ms. Morales-Alfaro, directly and proximately caused her damages.

### PLAINTIFF'S DAMAGES AND PRAYER FOR RELIEF

161.    WHEREFORE, the Plaintiff prays this court award of judgment against the Defendants for the above-described violations of her constitutional rights and breaches of duty to her, without limitation, as follows:

162.    In favor of the Plaintiff, and against the above-named Defendants, joint and severally, for compensatory and special damages, in an amount which will fairly and reasonably compensate her for the violation of her constitutional rights;  her past and future medical care;  for her past and future pain and suffering, and disability;  and for as set forth above, in an amount to be determined by a jury at trial in this matter.

163.    For injunctive and other equitable relief, reforming the Defendants' policies, practices and procedures to prevent like actions and harms in the future.

164.    For all costs, disbursement and attorney fees, and for other such relief as the Court deems just and reliable.

165.    WHEREFORE, Plaintiff requests this Court to enter a Judgment in her favor of compensatory and punitive damages.  She further seeks attorney fees and costs and such other relief as may be just and proper.  In addition, Ms. Morales-Alfaro further seeks appropriate discipline or termination for all responsible officials and all other relief available, for which she qualifies.

### PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY

Respectfully submitted this Tenth day of January, 2020.

s/Joy Bertrand
Joy Bertrand
Attorney for Plaintiff