**Joy Bertrand, Esq.**
PO Box 2734
Scottsdale, Arizona 85252-2734
Telephone:  602-374-5321
Fax:  480-361-4694
joyous@mailbag.com
www.joybertrandlaw.com
California State Bar No. 303206

**ATTORNEY FOR:  PLAINTIFF**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Rubia Mabel Morales-Alfaro, individually,** <br><br> **Plaintiff,** <br><br> **v.** <br><br> **U.S. DEPARTMENT OF HOMELAND SECURITY; CoreCivic, Inc.;  and JANE AND JOHN DOES 1-20,** <br><br> **Defendants.** | Case No. 20-CV-0082 <br><br> **THIRD AMENDED COMPLAINT** <br><br> **(Jury Trial Demanded)** |

Now comes the Plaintiff, Rubia Mabel Morales-Alfaro, to submit her Complaint against the above-named Defendants.  She further submits the following:

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................4

THE PARTIES .....................................................................................................5

I.  The Plaintiff.................................................................................................5

II.  The Defendants ...........................................................................................6

JURISDICTION AND VENUE.........................................................................8

STATEMENT OF FACTS.................................................................................10

I. Immigration Detention ................................................................................11

II.  DHS' Deliberate Decision to Detain Pregnant Women .............................15

III.  ICE Standards for the Treatment of Pregnant Detainees..........................17

III.  CoreCivic's Known History of Choosing Profit Over Prisoners' Well Being................................................................................17

IV.  The United States' Intentional Evasion of Immigration Detention Death Statistics ................................................................................. 19

V.  Immigration Detention Centers and United States' Contractual Relationship with CoreCivic.  ..........................................................................20

VI.  CoreCivic's Established History of Choosing Profit Over Prisoner Well-Being. ...............................................................................................................27

VII.  Documented, Punitive, Dangerous Conditions for Pregnant Women at the Otay-Mesa Immigration Facility................................................................. 31

VIII.  The United States' Knowledge of the Risks Presented Pregnant Women in ICE Detention..............................................................................................34

IX.  The State of California's Findings Regarding Conditions at ICE Detention Centers. ...........................................................................................................36

X.  Ms. Morales-Alfaro Lands in the Clutches of ICE and CoreCivic. .............37

*A.   Ms. Morales-Alfaro's Pre-Natal Care (or Lack Thereof) While Detained.* ........................................................................................38

*B.   Ms. Morales-Alfaro's Prenatal Diet (or Lack Thereof) While Detained*....40

PLAINTIFF'S CAUSES OF ACTION AGAINST THE DEFENDANTS .............43

Count One -- Violation of Plaintiff's Rights Under the Fifth and Fourteenth Amendments (Deliberate Indifference to Serious Medical Needs)(All Defendants) ......................................................................................43

Count Two -- Violations Of The Fifth and Fourteenth Amendment (Punitive Civil Detention Conditions)(All Defendants)..................................45

Count Three – Violations of the Fifth and Fourteenth Amendment (Discrimination Based on Nationality and Ethnicity) (All Defendants)..........46

Count Four – Violation of the Administrative Procedure Act – Agency Action Withheld (Defendant United States)) .................................................47

Count Five – Violations of the Rehabilitation Act (United States and CoreCivic) ......................................................................................................48

Count Six Negligence (All Defendants)..........................................................49

Count Seven -- Negligent Infliction of Emotional Distress (Defendant CoreCivic) ..................................................................................................... 51

Count Eight – Negligent Supervision and Training of Employees (Defendant CoreCivic) ..................................................................................................... 51

Count Nine – *Respondeat Superior* Liability (Defendant CoreCivic) .............53

Count Ten – Negligent Infliction of Emotional Distress (Defendant United States) ...........................................................................................................52

Count Eleven – Negligent Supervision of Employees  ...................................55

PLAINTIFF'S DAMAGES AND PRAYER FOR RELIEF..................................55

CERTIFICATE OF SERVICE...........................................................................57

**INTRODUCTION**

1.      If the United States chooses to detain asylum seekers – and it is a deliberate choice – then we must ensure that detained asylum seekers receive prompt, effective, medical care.  We also must also protect the constitutional rights of the asylum seekers we entrust to any private contractor.  Those constitutional rights include the right to sleep, to basic hygiene, and timely medical care.  The United States also must ensure that the conditions maintained by any contractor it hires to house detained asylum seekers are not punitive.

2.      The Defendants failed Rubia Mabel Morales-Alfaro, an asylum seeker from El Salvador, in each respect.  As shown, *infra*, the conditions at the Otay-Mesa ICE Detention Center are deliberately punitive.  CoreCivic – and, in particular, the Otay-Mesa facility it manages -- has a pattern and practice of delaying and avoiding medical care for serious medical conditions, such as a pregnancy in distress.  The facility feeds the asylum seekers nutritionless, inedible food.  The facility denies them sleep, with cold temperatures and no blankets.  As of a result of these conditions, Ms. Morales-Alfaro miscarried on or about January 15, 2018.

3.      As discussed further, *infra*, the Defendants have colluded in instituting and implementing policies that are designed to inflict severe harm on Central American immigrants, to deter them from coming to the United States in the first place and force those who do arrive to abandon their asylum claims.

4.      Plaintiff now seeks redress, as for Defendants' violations of law, including: the Fifth Amendment Due Process Clause (Punitive Immigration Detention Conditions);  the Fifth Amendment Due Process Clause (right to adequate health care);  Equal Protection (prohibiting discrimination on the basis of race, ethnicity, or national origin);  28 U.S.C. §§ 1986 (prohibiting conspiracy to violate civil and constitutional rights);  and negligence.

## THE PARTIES

### I.    The Plaintiff

5.      The Plaintiff, Rubia Mabel Morales-Alfaro, is a Hispanic female, who presently resides in Fort Smith, Arkansas.

6.      Between December 25, 2017 and March 1, 2018, Ms. Morales-Alfaro was detained as an asylum seeker from El Salvador, having entered the United States at the United States-Mexico border south of San Diego, California.

7.      During her civil immigration detention, she was held at the Otay-Mesa, California ICE detention center, operated by CoreCivic.

8.      Plaintiff was released from detention in March 2018 and has sued within sufficient time to cover each and every incident of her detention.

9.      Ms. Morales-Alfaro currently resides in the United States on an immigration bond, while her asylum claim is pending.

10.     Ms. Morales faces a real risk of returning to immigration detention. Only 38 percent of all asylum applications were granted in 2018 – a 33 percent decrease since 2014.[2]

11.     If Ms. Morales-Alfaro's asylum claim is denied, she could be subject to immigration detention and deportation, even before her time to appeal the decision ends.

12.     Ms. Morales suffered actual injury as a result of the putatively illegal conduct of the Defendants that can be fairly traced to the defendant's challenged conduct, and which "is likely to be redressed by a favorable decision."[3]

## II.     The Defendants

13.     The Department of Homeland Security is an executive branch agency of the United States Government, headquartered in Washington, District of Columbia.

14.     United States Immigration and Customs Enforcement is a sub-agency of the Department of Homeland Security.

[2] U.S. Department of Justice, Executive Office of Immigration Review, Statistics Yearbook, 2018, at 27, available at https://www.justice.gov/eoir/file/1198896/download (last visited February 10, 2020).

[3] *Melendres v. Arpaio,* 695 F. 3d 980, 997 (9th Cir. 2012), applying *Mayfield v. United States,* 599 F.3d 964, 970 (9th Cir.), *cert. denied,* 562 U.S. 1002 (2010);  *Armstrong v. Davis,* 275 F.3d 849, 861 (9th Cir.2001), *abrogated on other grounds by Johnson v. California,* 543 U.S. 499 (2005);  and  *LaDuke v. Nelson,* 762 F.2d 1318, 1323 (9th Cir.1985).

15. United States Customs and Border Protection is a sub-agency of the Department of Homeland Security.

16. The United States is sued, in part, pursuant to the Federal Tort Claims Act. ("FTCA"). Those claims are integrated into this Complaint.

17. At all times relevant to this Complaint, health care services at the Otay-Mesa ICE detention center were provided by the ICE Health Services Corps. The ICE Health Services Corps is a federal government agency, under the DHS/ICE umbrella.[4]

18. The ICE Health Service Corps oversees administration, investigates detainee complaints related to health care, and manages medical payment authorizations for detainee care inspection of medical care at all Detention Facilities.[5]

20. IHSC also monitors and conducts inspections at all facilities, including those in which health care is provided by a contractor.

21. ICE has also created a Detention Monitoring Council ("DMC"), comprised of ICE senior leadership, that is supposed to meet regularly to review problems uncovered by the internal or external oversight entities.

[4] *ICE Health Service Corps*, U.S. Immigration & Customs Enf't (Last Updated: February 26, 2019), https://www.ice.gov/features/health- service-corps.
[5] U.S. Gov't Accountability Office, *GAO-16-231*, *supra* note 69, at 11.

22.     In addition, the DMC supposedly meets immediately after any detained individual's death or other critical incident.6

23.     "John/Jane Doe DHS Defendants" were employed by DHS and its component agencies, including CBP and ICE, and their identities are at this time unknown to Plaintiff.  Their responsibilities required at least in part, ensuring that: apprehensions and processing of individuals who cross the border were carried out lawfully;  detention facilities did not impose punitive conditions;  individuals in their care had timely and adequate health care;  and ensuring that all of their duties and responsibilities were conducted and carried out in accordance with the law.  When and if the identities of John/Jane Doe DHS Defendants become known, Plaintiff may amend this Complaint to add specific officers, employees, or agents as named Defendants.

24.     Defendant CoreCivic, Inc., is a Maryland corporation with its principal place of business at 10 Burton Hills Blvd., Nashville, Tennessee 37125.

---

6 *Holiday on ICE: The U.S. Dep't of Homeland Sec.'s New Immigration Detention Standards Subcomm. on Immigration Policy Enf't, the* Judiciary, 112th Cong. 112-14 (2012), Statement of Assistant Dir. Office of Det. Policy Planning, U.S. Immigration And Customs Enf't,), available at https://archive.org/stream/gov.gpo.fdsys.CHRG-112hhrg73543/CHRG-112hhrg73543_djvu.txt.

## JURISDICTION AND VENUE

25.    This Court has original jurisdiction over this matter pursuant to 28 USC § 1331, because her claims arise under the Constitution, laws, or treaties of the United States.

26.    The United States is named as a defendant, pursuant to the Federal Tort Claims Act.

27.    Ms. Morales filed her Notice of Claims with the United States contemporaneously with the filing of this lawsuit.

28.     On or about January 23, 2020, the United States denied Ms. Morales-Alfaro's FTCA claims.

29.    As to the Individual DHS Defendants, this Court has subject matter jurisdiction pursuant to 28 U.S.C §§ 1331 and 1343(a) because Plaintiffs' claims arise under the Fifth Amendment to the United States Constitution, *Bivens  v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and 42 U.S.C. §§ 1985 and 1986.

30.    As to Defendant CoreCivic, this Court has supplemental jurisdiction under 28 U.S.C. 1367(a), because the claims are part of the same case or controversy as the as the claims over which the Court has original jurisdiction.

31.    For state law tort claims raised in this Complaint, Ms. Morales-Alfaro relies upon the law of the jurisdiction in which her injury occurred – California.

32.     Ms. Morales-Alfaro seeks declaratory and/or injunctive relief, compensatory and punitive damages, attorney fees and costs, and such other relief that may be available to her.

33.     This Court has authority to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, and Rule 57 of the Federal Rules of Civil Procedure.

34.     This Court has authority to grant injunctive relief in this action pursuant to 5 U.S.C. §§ 702, 706 and Rule 65 of the Federal Rules of Civil Procedure.

35.     This Court has personal jurisdiction over the Defendants in this matter and the underlying acts of this complaint took place in the Southern District of California.

36.     Venue in this district is proper under 42 U.S.C. § 1391, because, as described below, a substantial part of the acts or omissions giving rise to Ms. Morales-Alfaro's claims occurred in the Southern District of California.

**STATEMENT OF FACTS**

37.     Immigration proceedings are civil matters, and immigration detention is likewise civil and therefore should be "nonpunitive" in nature.[7]

38.     Ms. Morals-Alfaro was not detained pursuant to criminal charges or convictions, so the conditions in which she was held must reflect that distinct

_____

[7] *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).

custody status and must not be similar to, or worse than, the conditions of confinement in jails and prisons.

**I.      Immigration Detention.**

*A.      DHS' Intent Behind ICE Detention.*

39.     The conditions in ICE detention centers are deliberately designed to be punitive and to mirror prisons

40.     When the core standards governing detention in federal facilities were promulgated in January 2000, the U.S. Department of Justice allowed the core standards for immigration detention facilities to be the same as those governing the U.S. Bureau of Prisons.[9]

41.     Likewise, ICE's current national standards governing immigration prisons were promulgated in cooperation with the American Correctional Association ("ACA").[10]

42.     Since at least 2014, ICE's detention policies have become increasingly, deliberatively punitive in nature.

43.     Then-DHS Secretary Jeh Johnson described detention and removal as key parts of the Obama Administration's "*aggressive deterrence*

[9] Office of the Federal Detention Trustee, *Detention Standards & Compliance Division: History of the Federal Performance-Based Detention Standards*, https://www.justice.gov/archive/ofdt/qap-brochure.pdf.
[10] *Facility Inspections*, ICE, https://www.ice.gov/facility-inspections.

*strategy* focused on the removal and repatriation of recent border crossers" (emphasis added).[11]

44.    ICE detainees wear red and orange jumpsuits that sometimes read "inmate" on the back.

45.    After his election, President Trump and members of his soon-to-be administration, immediately began planning ways to exclude immigrants from countries that they considered undesirable.  In developing many of its immigration strategies, the administration appears to have been inspired by a 79-item list of "immigration actions the next president can take" prepared in April 2016 by the Center for Immigration Studies ("CIS").

46.    In a January 2019 article evaluating the degree to which President Trump had achieved the items on its anti-immigration wish-list, CIS clearly stated that certain of its recommendations were specifically targeted at Central Americans, including its recommendations for restricting the ability of individuals entering at the southern border to claim asylum. longstanding ties to CIS.  They have appeared at CIS conferences and events and repeatedly referenced and relied on CIS's work.

[11] Jeh Johnson, "Statement Before the Senate Committee on Appropriations," July 10, 2014, available at https://www.dhs.gov/news/2014/07/10/statement-secretary-homeland-security-jeh-johnson-senate-committee-appropriations (last visited January 10, 2020).

47.     Many of the proposals on the CIS list are geared toward stopping what it calls the "surge of arrivals on our southern border."

48.     President Trump has spoken openly about his animus towards certain immigrants, including those from El Salvador, which, in January 2018, he included in a list of "shithole countries."

49.     By contrast, President Trump has stated that the United States should instead favor immigrants from countries like predominantly white Norway. Promoting immigration from Europe has been a consistent theme of the President's immigration rhetoric.

50.     President Trump has made clear that he believes Central American immigrants are an undesirable group, complaining that people who do not share his views of this population "don't care about crime and want illegal immigrants, no matter how bad they may be, to pour into and infest our Country."

51.     During a Cabinet meeting, while discussing immigration policies President Trump suggested that immigration by Central Americans would mean "our country will be overrun by people, by crime, by all of the things that we don't stand for—and that we don't want."

52.     Each of the DHS  Defendants is aware of President Trump's animus towards immigrants from Central America based on his public and private statements.  They serve or served at the pleasure of the President, and in their roles, they have implemented the Administration's discriminatory agenda,

including through initiatives and/or practices that disfavor non-white, non-European individuals generally and target Central Americans specifically.

53. President Trump has expressed his animus toward Central Americans perhaps more bluntly and with more frequency than other members of his Administration. But, upon information and belief, the President's most senior advisors, including the heads of ICE and CBP, agreed with and shared President Trump's desire to deter immigration from Central America and/or took steps to facilitate governmental conduct that they knew was based on a repeatedly and publicly proclaimed discriminatory animus against Central Americans.

54. The discriminatory animus toward Central American immigrants held by these top government officials was and is shared by officials at DHS and encouraged and emboldened lower-level DHS officials, including John/Jane Doe DHS Defendants, to act consistently with that animus.

55. Ongoing litigation has, for example, revealed an environment at CBP in which demeaning epithets are common and in which violence against immigrants at the southern border is treated as a joke. For example, a CBP agent in Arizona, who rammed a truck into an unarmed Guatemalan man he suspected was an unauthorized border crosser, as the individual retreated across the border, represented in court filings that slurs and expressions of hatred were not isolated incidents, but regular *features* of the culture at CBP.

56.     A recently identified private Facebook page, with 9,500 members who are primarily current and former CBP agents, corroborates the rampant culture of bigotry and cruelty at CBP.

57.     Members of the Facebook group, which existed during the separation crisis, joked about the deaths of migrants, discussed throwing burritos at Latino members of Congress, and circulated a vulgar illustration depicting Representative Alexandria Ocasio-Cortez, a Latina, performing oral sex on detainees.  It has been reported that the chief of CBP was, herself, a member of that Facebook group.

58.     Upon information and belief, the head of CBP was thus aware of the rampant bigotry within her agency and yet did nothing to address it.

59.     This culture of discriminatory animus was not limited to CBP.  Ian M. Smith, a former DHS analyst who was forced to resign after the press revealed his ties to neo- Nazis and white nationalist groups, allegedly attended multiple immigration policy meetings at the White House.

## II.     DHS' Deliberate Decision to Detain Pregnant Women.

60.     Federal regulations give ICE the authority to parole asylum seekers who have presented themselves at a port of entry into the U.S. during the pendency of their asylum hearings.[14]

[14]  8 C.F.R. § 212.5

61.    In fact, these regulations 8 C.F.R. § 212.5(b)(1) specifically authorize ICE to release pregnant women.[15]

62.    ICE policy directives also authorize parole for those asylum seekers who have passed the "Credible Fear Interview," a mechanism by which DHS filters out non-meritorious asylum claims.

63.    ICE Detained nearly 68,000 women in FY 2017.[16]

64.    Since the 2016 election, the number of pregnant women held in ICE detention has increased 52%, from 1,377 in 2016 to 2,094 in 2018.[17]

65.    Between 2012 and 2014, ICE held 559 pregnant women in detention.[18]

66.    Between October 1, 2017 and August 31, 2018, ICE held in detention 1,655 pregnant women.[19]

---

[15]  8 C.F.R. § 212.5(b)(2).

[16]  Letter from Members of Congress to The Honorable Elaine Duke, Acting Secretary of Homeland Security, October 31, 2017, available at https://jayapal.house.gov/sites/jayapal.house.gov/files/documents/WWG%20Letter%20on%20Pregnant%20Women%20in%20ICE%20Custody%202017_10_31.pdf (last visited February 27, 2018), citing Complaint: US Immigrations and Customs Enforcement's Detention and Treatment of Pregnant Women (Filed September 26, 2017), available at https://www.aclu.org/legal-document/pregnant-women-ice-custody-complaint-dhs-office-civil-rights-and-civil-liberties-and. (last visited February 27, 2018).

[17]  Government Accountability Office, "Report to the Chairwoman Subcommittee on Immigration and Citizenship, Committee on the Judiciary, House of Representatives: Immigration Enforcement: Arrests, Detentions, Removals, and Issues Related to Selected Populations," December 5, 2019 at 58, available at https://context-cdn.washingtonpost.com/notes/prod/default/documents/fd42c373-ec7d-4257-823d-bf79fa9be66e/note/84690b38-8596-4686-af94-e51234f095b4.pdf

[18]  Letters from Members of Congress, supra note 10.

[19]  *Id.*

67.     This sharp increase in the number of pregnant women detained by ICE is the result of ICE's 2018 deliberate policy decision to end the presumptive release of pregnant women, to "better align with the President's Executive Order (EO) 13768 *Enhancing Public Safety in the Interior of the United States.*"[20]

68.     None of the ICE detention facilities' medical units are equipped to provide the specialized care needed by pregnant women;  the women are taken outside the detention center for their routine medical visits.[21]

69.     There were at least 28 miscarriages in immigration custody in FY 2017.[22]

**III.     ICE Standards for the Treatment of Pregnant Detainees**

70.     In 2016, ICE issued a policy advising against the detention of pregnant women, with the rationale that incarceration creates serious health risks for

[20] U.S. Immigration and Customs Enforcement, "FAQs: Identification and Monitoring of Pregnant Detainees," available at https://www.ice.gov/faqs-identification-and-monitoring-pregnant-detainees#wcm-survey-target-id (last visited January 10, 2020); see also, U.S. Immigration and Customs Enforcement Directive 11032.3, "Identification and Monitoring of Pregnant Detainees," December 14, 2017, available at https://www.ice.gov/sites/default/files/documents/Document/2018/11032_3_PregnantDetaines.pdf (last visited January 10, 2020).

[21] Robyn Barnard, et al., "Prisons and Punishment:  Immigration Detention in California," Human Rights First, January 2019 Report, at 12, available at https://www.humanrightsfirst.org/sites/default/files/Prisons_and_Punishment.pdf (last visited January 8, 2020).

[22] *Id*.

expectant mothers, and detention facilities are not equipped to serve those unique needs.

71.    In December 2017, Thomas Homan, the acting director of ICE, announced that the agency would change that directive to comply with President Trump's executive order  on immigration and eliminate the presumption of release for pregnant women.

72.    ICE requires contractors to adhere to the most current ICE-issued detention standards, the Performance-Based National Detention Standards (PBNDS), last issued in 2011.

73.    The standards require, "A pregnant detainee in custody shall have access to pregnancy services including routine or specialized prenatal care, pregnancy testing, comprehensive counseling and assistance, postpartum follow up, lactation services and abortion services."[23]

74.    Those standards also require, in part, **"**If a pregnant detainee has been identified as high risk, the detainee shall be referred, as appropriate, to a physician specializing in high risk pregnancies."[24]

75.    ICE policies further provide:

A pregnant woman or women in post-delivery recuperation shall not be restrained absent truly extraordinary circumstances that render restraints absolutely necessary as documented by a supervisor or directed by the on- site medical authority. This general prohibition on restraints applies to all pregnant women in the custody of ICE, whether during transport, in a detention

[23]  PBNDS 4.4.II.3.
[24]  PBNDS 4.4V.E.

on facility, or at an outside medical facility.  Restraints are never permitted on women who are in active labor or delivery.[25]

76.     DHS and its contractor, CoreCivic, followed none of these rules with Ms. Morales-Alfaro's pregnancy.

**IV.     The United States' Intentional Evasion of Immigration Detention Death Statistics.**

77.     Defendants evade their reporting responsibilities by interpreting Congress's mandate to complete reports on an "in-custody death" not to include deaths in which a detained person is transferred to a hospital to die.[26]

78.     Those few times when ICE makes adverse findings regarding conditions in Detention Facilities, they typically do not result in any consequences for its contractors.  A January 2019 OIG report found numerous deficiencies in ICE's contract enforcement mechanisms.[27]

79.     Also underscoring the DHS Defendants' deliberate evasion from public accountability, DHS does not include stillborn babies in its accounting of miscarriages in ICE custody.[28]

[25] *Id.*

[26] *A Trans Asylum Seeker Dies After Pleading to ICE for Medical Care*, The Nation (June 4, 2019), https://www.thenation.com/article/ice-otero-joa-transgender- death/.

[27] Office of Inspector Gen., U.S. Dep't of Homeland Sec., *OIG-19-18*, *supra* note 45, at 15.

[28] U.S. Immigration and Customs Enforcement, "News Release from CBP and ICE on Stillbirth in Custody," February 25, 2019available at https://www.ice.gov/news/releases/joint-statement-ice-and-cbp-stillbirth-custody (last visited June 3, 2019).

80.    The DHS defendants' history of manipulating in-custody death data, combined with its repeated enforcement failures raises an inference of deliberate conduct, as opposed to incompetence.

**V.    Immigration Detention Centers and United States' Contractual Relationship with CoreCivic.**

81.    Nine in ten of the country's largest immigration detention facilities are operated by private companies like CoreCivic.  These facilities hold approximately two-thirds of the civil immigration detainees in a system that currently keeps more than 31,000 people in custody on a typical day. ___.

82.    The for-profit civil immigration detention business is worth over $3 billion dollars per year.

83.    The United States utilizes a centralized process to identify and enter into contracts with private and public entities to detain individuals in their custody; to administer those contracts;  and to determine what, if any, actions will be taken against contractors who provide substandard care.

84.    The United States maintains a policy and practice of systemically failing to monitor and enforce requirements to provide timely access to medical and mental health care.

85.    Across the DHS Defendants' network of detention facilities, detained individuals experience lengthy and dangerous delays, and often outright denials, in receiving medical and mental health care.

86.    ICE's Office of Acquisitions Management administers and manages these *via* a process that ICE has centralized "in order to aggressively enforce contract compliance and initiate new procurements."

87.    ICE's Office of Acquisitions  Management contracting officers have signature authority to execute and modify contracts, and they appoint Contract Officers' Representatives ("CORs").[39]

88.    In procuring space in facilities for its detainees, ICE does not use any of the three lawful procurement means available to federal agencies.[40]

89.    In 2018, the DHS Office of the Inspector General ("OIG") found that "ICE has no assurance that it executed detention center contracts in the best interest of the Federal Government, taxpayers, or detainees."[41]

90.    That same report found that ICE intentionally circumvented the federal procurement process to render CoreCivic's performance "effectively insulated from government scrutiny."[42]

[39] Office of Inspector Gen., U.S. Dep't of Homeland Sec., *OIG-19-18: ICE Does Not Fully Use Contracting Tools to Hold Detention Facility Contractors Accountable for Failing to Meet Performance Standards*, at 5 (Jan. 29, 2019), 25 https://www.oig.dhs.gov/sites/default/files/assets/2019-02/OIG-19-18-Jan19.pdf

[40] Office of Inspector Gen., U.S. Dep't of Homeland Sec., *OIG-18-55:Immigration and Customs Enforcement Did Not Follow Federal Procurement Guidelines When Contracting for Detention Services*, at 19 (Feb. 21, 2018), https://www.oig.dhs.gov/sites/default/files/assets/2018-02/OIG-18-53-Feb18.pdf

[41] Office of Inspector Gen., U.S. Dep't of Homeland Sec., *OIG-18-55,* at 3.

[42] *Id.* at 6.

91.     In 2019, DHS OIG found that the United States failed to thoroughly vet programs and services at its detention facilities, use lax procurement requirements, and enter into vague and toothless contracts. [43]

92.     The United States' failure to properly monitor its detention facilities begins with the very contracts intended to govern the conditions in which non-citizens are detained.

93.     In the fall of 2016, Assistant Attorney General Sally Yates directed the U.S. Department of Justice to begin to phase out the use of private prisons for federal prisoners, based in part on a recognition that conditions in privately run facilities were substandard.[44]

94.     Shortly thereafter, then-Secretary of DHS Jeh Johnson established a Subcommittee at DHS to consider whether DHS should follow suit.  While acknowledging that the use of private providers and local jails was likely to continue, the Subcommittee, in a report issued in December 2016, offered multiple recommendations, including that DHS expand its oversight over such facilities, improve the quality and quantity of inspections at facilities, and initiate unannounced inspections.[45]

[43] Office of Inspector Gen., U.S. Dep't of Homeland Sec., *OIG-19-18, supra note 11* , at 15

[44] Memorandum from Sally Yates, Deputy Att'y Gen, to the Acting Dir. of the Fed. Bureau of Prisons, at 1-2 (Aug. 18, 2016), https://www.justice.gov/archives/opa/file/886311/download.

[45] Homeland Security Advisory Council, U.S. Dep't of Homeland Sec., *Report of the Subcommittee on Privatized Immigration Detention Facilities*, at 3 (Dec. 1, 2016),

95.     ICE's Custody Management Division ("CMD") contracts with inspectors to conduct routine inspections of Detention Facilities, assess compliance with ICE detention standards, and develop corrective actions plans.  OMD also oversees the on-site Detention Monitoring Program and operates the Detention Reporting and Information Line, which detained individuals and others can use to file complaints.[46]

96.     The DHS Office of Inspector General, DHS Office of Civil Rights and Civil Liberties ("CRCL") and ICE Office of Detention Oversight ("ODO") are also responsible for conducting inspections to ensure compliance with detention standards and applicable law.[47]

97.     ODO and ICE's External Reviews and Analysis Unit are also responsible for conducting a Detainee Death Review ("DDR") after a detained individual dies.[48]

https://www.dhs.gov/sites/default/files/publications/DHS%20HSAC%20PIDF%20Final%20Report.pdf

[46] *Lives In Peril: How Ineffective Inspections Make ICE Complicit In Detention Center Abuse*, National Immigrant Justice Center (October 22, 2015), https://www.immigrantjustice.org/lives-peril-how-ineffective-inspections- make-ice-complicit-detention-center-abuse-0.

[47] *Id.*

[48] *See e.g.*, Office of Professional Responsibility, *Detainee Death Review – Sergio Alonso Lopez*, at 1 ("Sergio Alonso Lopez DDR"), https://www.ice.gov/doclib/foia/reports/ddrLopez.pdf; Office of Professional Responsibility, *Detainee Death Review – Moises Tino Lopez*, at 1 ("Moises Tino Lopez DDR"), https://www.ice.gov/doclib/foia/reports/ddr-Tino.pdf.

98.     Both the U.S. Government Accounting Office and DHS OIG have repeatedly expressed concern over major structural deficiencies in ICE's contract and oversight system.

99.     In 2016, GAO found that it is unclear whether IHSC's data tracking system "will capture all medical complaints received by DHS or facilitate analyses of complaints over time and across facilities" and that, because of a lack of resources allocated, "ICE does not utilize the data gathered . . . in a way that examines overall trends in medical care deficiencies."[49]

100.    The GAO observed that under CMD's monitoring scheme, a facility may be found deficient as to individual systemic medical provision criteria, but still be found compliant with the overall relevant medical care standard.[50]

101.    At smaller facilities, ICE does no systematic analysis of inspection reports.[51]

102.    ICE performs no analysis on the complaints received by ODO, CRCL, and IHSC;  and ICE has no plans to perform any type of analysis on complaints received by ODO, CRCL, and IHSC.[52]

103.    ICE's own officials have raised concerns related to monitoring of ICE Health Services Corps in these facilities.  In a memo from December 2018, an ICE supervisor notified warned the acting secretary of DHS that "IHSC is

[49] U.S. Gov't Accountability Office, *GAO-16-231*, *supra* note 69, at 26.
[50] *Id.* at 21–22.
[51] *Id.* at 27.
[52] *Id.* at 26–27.

severely dysfunctional and unfortunately preventable harm and death to detainees has occurred . . . [and that] IHSC leadership is not focused on preventing horrible recurrences."[53]

104. The memo then detailed over a dozen cases in which detained individuals were not provided with proper medical and mental health care, including two that resulted in fatalities.[54]

105. Nongovernmental organizations have also repeatedly identified the systemic problems with ICE's inspection system. For example, a January 2018 report by the Detention Watch Network and National Immigrant Justice Center concluded that these inspections are fundamentally flawed in that "they are not independent, they do not include interviews with detained people, they provide advance notice to the facilities and look for the existence of policies rather than evidence that these policies are followed, and they often misrepresent conditions inside the facility, for example counting an indoor room with a skylight as outdoor recreation."[55]

106. Defendants' failure to properly monitor Detention Facilities has had deadly consequences. For example, an April 2017 OIG inspection found that

[53] Office of Inspector General, U.S. Dep't of Homeland Sec., *OIG-19-47: Concerns About ICE Detainee Treatment and Care at Four Detention Facilities*, at 3 (Jun. 3, 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-06/OIG-19- 47-Jun19.pdf.
[54] *Id.*
[55] Detention Watch Network & National Immigrant Justice Center, *supra* note 13, at 6.

CoreCivic's Stewart Detention Center staffing issues created a prisoner care situation that that one employee to describes as "a ticking time bomb."[56]

107. Even after inspections reveal major flaws, the United States regularly fails to take corrective action. Though ERO Field Offices are tasked to respond to inspection flaws with corrective plans, they "do not always respond"; "some respond late, submit incomplete responses, or report that facility deficiencies will continue due to local policies or conditions."[57]

108. Repeat offenses are common, as "ICE does not appear to have a comprehensive process to verify whether facilities implemented all the corrective actions until the next . . . inspection."[58]

109. Those few times when ICE makes adverse findings regarding conditions in Detention Facilities, they typically do not result in any consequences for its contractors. A January 2019 OIG report found numerous deficiencies in ICE's contract enforcement mechanisms.[59]

[56] Office of Inspector General, U.S. Dep't of Homeland Sec., *OIG Freedom of Information Act Request No. 2018-IGFO-00059 Final Response*, at 16 (April 25, 2018), https://www.wabe.org/wp-content/uploads/2018/05/2018-IGFO- 00059_Final-Response_watermark-4.pdf; *see also Investigation finds ICE detention center cut corners and skirted federal detention rules*, Public Radio International (March 15, 2018)*,* https://www.pri.org/stories/2018-03-15/investigation-finds- ice-detention-center-cuts-corners-and-skirted-federal; Katherine Hawkins, *Outsourced Oversight*, Project on Government Oversight (March 12, 2019), available at https://www.pogo.org/investigation/2019/03/outsourced- oversight/.
[57] Office of Inspector Gen., U.S. Dep't of Homeland Sec., *OIG-18-47*, at 11.
[58] *Id*. at 12.
[59] Office of Inspector Gen., U.S. Dep't of Homeland Sec., *OIG-19-18*, *supra* note 45, at 15.

## VI.    CoreCivic's Established History of Choosing Profit Over Prisoner Well-Being.

110.    CoreCivic operates hundreds of private prisons – to include immigration detention centers -- across the United States.

111.    CoreCivic was created by a group of Tennessee businessmen and generated $1.9 billion in revenue for the 12 months prior to September 2019, according to S&P Global Market Intelligence.

112.    CoreCivic's CEO, Damon Hininger, started his career as a corrections officer at Leavenworth Detention Center in Kansas in 1992 and steadily rose through the ranks, becoming CEO in 2009 and earning $4.1 million in total compensation by 2018.[63]

113.    CoreCivic's facilities are used both for individuals who have been convicted of a crime and for incarcerating civil immigration detainees.

114.    The population of civil immigration detainees includes refugees who are seeking asylum.  Individuals detained at the border are only released only on a case-by-case basis by the authority of the U.S. Bureau of Immigration and Customs Enforcement (ICE).

[63]  Monsy Alvarado, *et al.*, "These People are Profitable: Private prison companies have detained immigrants for decades, but that business has exploded under President Trump," USA Today, February 16, 2020, available at https://www.usatoday.com/in-depth/news/nation/2019/12/19/ice-detention-private-prisons-expands-under-trump-administration/4393366002/ (last visited February 16, 2020).

115.     Companies such as CoreCivic deny engaging in lobbying efforts, but private prison corporations such as CoreCivic routinely specifically target legislators over immigration "reform."

116.     By 2015, CoreCivic derived 51% of its revenue from federal contracts.

117.     In March of 2017, the Trump administration announced that the United States' civil immigration detention capacity would be increased by 20,000 beds (over four-hundred fifty percent (450%).  This signals increase in immigrant detention is the largest since World War II and from which CoreCivic derives nearly $1 billion a year in revenue.

118.     Between the 2016 Presidential election and February 24, 2017, CoreCivic's stock price surged 140%.[64]

119.     CoreCivic's acts were carried out with intent, malice, oppression, fraud, and duress.  CoreCivic acted with complete disregard of the rights and liberty of the detainees, without regard to their dignity or humanity.

120.     CoreCivic's actions are a continuing pattern and course of conduct.

[64] Heather Long, "Private Prison Stocks Up 100% Since Trump's Win," CNN Money, February 24, 2017, available at https://money.cnn.com/2017/02/24/investing/private-prison-stocks-soar-trump/index.html (last visited January 7, 2020);  Jeff Sommer, "Trump Immigration Crackdown is Great for Private Prison Stocks," New York Times, March 10, 2017, available at https://www.nytimes.com/2017/03/10/your-money/immigrants-prison-stocks.html (last visited January 10, 2020).

121.   CoreCivic has a lengthy history of refusing to provide adequate medical treatment to those it houses.[65]

122.   CoreCivic has repeatedly been the subject of investigations and lawsuits regarding delayed health care to inmates and detainees, often resulting in death.[66]

123.   In one lawsuit, Merideth Manning, a pregnant prisoner in Tennessee, miscarried late in her pregnancy and a former CCA nurse stated under oath, "the facility's medical unit was understaffed and over-worked for the number of prisoners, preventing proper medical care for all of the prisoners . . . The facility often relied on non-medical personnel to make medical decisions for

---

[65] *See, e.g., Grae v. Corr. Corp. of Am.*, No. 3:16-CV-2267, 2019 WL 1399600, at  *2 (M.D. Tenn. Mar. 26, 2019) (shareholder class certified alleging CoreCivic's "failure to provide sufficient medical services to its inmates."); *Dodson v. CoreCivic*, No. 3:17-CV-00048, 2018 WL 4800836, at *1 (M.D. Tenn. Oct. 3, 2018) (alleging deliberate inference to prisoners medical needs); *Pierce v. D.C.*, 128 F. Supp. 3d 250, 284 (D.D.C. 2015) (finding prisoner's ADA and Section 504 rights violated at CoreCivic facility).

[66] Seth Freed Walker, "Federal Officials Ignored Years of Internal Warnings About Deaths at Private Prisons," *The Nation*, June 15, 2016, available at https://www.thenation.com/article/federal-officials-ignored-years-of-internal-warnings-about-deaths-at-private-prisons/ (last visited January 8, 2020).  "At least 38 men died in the BOP's privately run prisons from 1998 to 2014 in the wake of inadequate medical care.  An examination of thousands of pages of previously unreleased files revealed that gravely ill prisoners had been left untreated, or relegated to the care of low-level medical workers.  In some facilities, inmates went months without seeing a doctor. Some prisoners who required emergency care were not transferred to a hospital, in an apparent attempt to save costs . . .   In a striking confirmation of these findings, the new records show that BOP monitors documented, between January 2007 and June 2015, the deaths of 34 inmates who were provided substandard medical care. Fourteen of these deaths occurred in prisons run by CCA [the prior corporate name for CoreCivic]."

prisoners. . . have worked in nursing and corrections for many years.  CCA's continuing mistreatment of prisoners is the worst I have ever witnessed."

124.    Eerily similar to Ms. Morales-Alfaro's case, in Manning's case, CCA staff ignored her pleas when she experienced vaginal bleeding over a three-day period in 2004 while pregnant.

125.    Manning received a $250,000 settlement from CCA, after filing suit in state court.

126.    In 2014, CoreCivic (then CCA) paid a $690,000 settlement for the death of another prisoner's baby.[68]

127.    In the 2014 case, the mother went into early labor at five months along. Guards ignored the nurse's order to take her to emergency room, resulting in a five-hour delay in getting mom and baby to hospital.[69]

128.    CoreCivic's excuses in that case ranged from "it was 'count' time" to "other codes were called in the facility."[70]

129.    On information and belief, there are least four other cases of CoreCivic denying care to pregnant women, resulting in the death of one woman and four babies.

[68] Derke Gilna, "$690,000 settlement in HRDC Suit Over Death of Prisoner's Baby at CCA Jail," Prison Legal News, June 8, 2015, available at https://www.prisonlegalnews.org/news/2015/jun/8/690000-settlement-hrdc-suit-over-death-prisoners-baby-cca-jail/.
[69] *Id.*
[70] *Id.*

130.    CoreCivic also profits from charging money for basic feminine hygiene supplies.

131.    Many of the women, like Ms. Morales-Alfaro, do not have the money to purchase sanitary pads and tampons, leaving them to go without these basic supplies.

132.    This practice is not only dehumanizing and humiliating, but it also creates a health hazard that endangers the detainees.

133.    The United States has been sued directly for similar denials of sanitary supplies and denying health care and proper sleeping arrangements to detained immigrants in CBP holding facilities.  On February 29, 2020, the Arizona District Court found that CBP's facilities in Southern Arizona, "Are presumptively punitive and violate the Constitution." [72]

**VII.    Documented Punitive, Dangerous Conditions for Pregnant Immigrants at the Otay-Mesa Immigration Facility.**

134.    At the time of a Human Rights First's visit to the ICE Otay-Mesa Detention Center in or about 2017, ICE confirmed that ten pregnant women were currently detained at the facility. [73]

[72] See, *e.g. Doe v. Wolf (previously Kelly)*, 878 F.3d 710 (9th Cir. 2017), Arizona District Court Number 15-CV-250.
[73] Robyn Barnard, et al., "Prisons and Punishment:  Immigration Detention in California," Human Rights First, January 2019 Report, at 12, available at https://www.humanrightsfirst.org/sites/default/files/Prisons_and_Punishm e nt.pdf (last visited January 8, 2020).

135.    The Otay-Mesa detention facility looks and acts like a prison.  It is ringed by a chain link fences topped with barbed wire and visitation is substantially restricted.[74]

136.    Otay-Mesa CoreCivic correctional officers strictly control the movement of immigration detainees.

137.    Ms. Morales-Alfaro and her fellow detainees allowed only a few hours of access to fresh air and sunlight each day.

138.    Ms. Morales-Alfaro was denied access to her personal clothing and most possessions.  She was required to wear prison garb.

139.    When transported outside of the CoreCivic facility, corrections officers placed the pregnant Ms. Morales-Alfaro in restraints.

140.    CoreCivic's – and, thus, ICE's – denial of medical care to Ms. Morales-Alfaro exacerbated the punitiveness of her detention.

141.    CoreCivic guards are the gatekeepers to medical care, although they are hardly medical providers.

142.    The CoreCivic guards decide, based on a detainee's written request, if will see a nurse at all and, if they allow it, when a nurse will see the detainee.

143.    In 2018, a former CoreCivic training officer at Otay-Mesa testified in a wrongful death suit brought by the estate of a former detained individual

[74]  A photo of the facility fencing is available at: https://www.freedomforimmigrants.org/otay-mesa-detention-center (last visited January 10, 2020).

there that short-staffing hindered officers' ability to notice when detained individuals required medical care and a referral to the medical unit.[75]

144.   To seek care, individuals in immigration regularly must make repeated, written requests to staff for medical attention—and then wait for days for a response.

145.   Once they do receive a response, it is often days, weeks, or months before they can see medical staff within Detention Facilities.

146.   They are commonly given over-the-counter pain medication as the only intervention, even if the underlying medical issue—like a looming miscarriage—requires more serious and immediate treatment.

147.   These brutal conditions stem directly from ICE's centralized policies, practices, and failures of meaningful oversight.

148.   The risk of harm to detained asylum seekers is substantial, irreparable, and ongoing.  Dozens have unnecessarily died as a result of insufficient care. Countless more have endured needless suffering from delays in medical care, refusals to accommodate disabilities, and nearly constant isolation. Conditions in detention are so brutal that many people are forced to abandon

[75] Samantha Michaels, *Understaffed Federal Prison Is Taking in 1,000 Noncriminal Immigrants, and Even the Guards Are Protesting*, Mother Jones, (June 21 15, 2018) https://www.motherjones.com/crime justice/2018/06/understaffed- federal-prison-is-taking-in-1000-noncriminal-immigrants-and-even-the-guards-are- protesting/.

viable claims for immigration relief and accept deportation out of a desperate desire to escape the torture they are enduring in detention on U.S. soil.

149.    Given the Defendants' familiarity with the conditions in detention facilities—including lack of medical care, lack of sleep, and lack of proper food -- their adoption of practices and policies that perpetuate these conditions reflects an intention to punish persons believed to be unlawfully present in the United States.  This punitive intent is also reflected in the CBP's policy of "Consequence Delivery," whereby Defendants seek to deter unauthorized immigration by inflicting specified "consequences," punishment— including criminal prosecution and prison terms --  on detained immigrants.

150.    The harsh conditions and mistreatment that define DHS' detention operations are themselves a form of punishment.  As a Border Patrol spokesman stated, in response to complaints of overcrowding and punitive holding cell conditions in Texas, "That's basically one of the consequence[s] of entering the country illegally."[76]

**VIII. The United States' Knowledge of the Risks Presented to Pregnant Women in ICE Detention.**

151.    Before Ms. Morales arrived at the ICE Otay-Mesa Detention Center, the United States had specific knowledge that the medical care provided by ICE

[76] Amy Bracken, *Immigrants, Legal Groups Allege Harsh Treatment at U.S. Borders*, PRI (Aug. 1, 2014), *available at* http://www.pri.org/stories/2013-08-01/immigrants- legal-groups-allege-harsh-treatment-us-border

Health Services Corps to pregnant women at the facility was dangerously lacking.

152.   A complaint filed with the United States DHS' Office for Civil Rights and the DHS OIG in  September 2017 detailed the account of "Teresa," a 31-year-old Honduran woman who was four months pregnant when she arrived at the southern border to seek asylum and suffered a miscarriage in detention.

153.   "Teresa" first notified CBP officers of her extremely heavy blood flow while at the CBP facility on the border, yet she was transferred to the ICE Otay-Mesa Detention Center instead of a hospital.

154.   At the detention center, "Teresa" notified the medical personnel of her bleeding and asked to be taken to the hospital, which did not happen. Several days later, medical staff at the ICE Otay-Mesa Detention Center confirmed "Teresa" had miscarried.[77]

155.   In March 2018, the American Academy of Pediatrics and other medical groups called on DHS to stop detaining pregnant women, because "conditions in DHS facilities are not appropriate for pregnant women" and detention puts the health of pregnant women at "great risk."[78]

[77] American Immigration Council, "Increasing Numbers of Pregnant Women Facing Harm in Detention, Administrative Complaint filed with Office for Civil Rights and Civil Liberties, and the Office of the Inspector General," (Sept. 26, 2017), 8-9, *available at*: https://www.americanimmigrationcouncil.org/advocacy/detained-pregnant-women.
[78] AAP News, "AAP, medical groups urge ICE not to detain pregnant women," (Apr. 2, 2018),

156.   The number of fetal demise incidents in ICE custody cannot be determined with certainty because, "for investigative and reporting purposes, a stillbirth is not considered an in-custody death."[79]

## IX.   The State of California's Findings Regarding Conditions at ICE Detention Centers.

1157.   In February 2019, the California Department of Justice published the findings of its review of all ten ICE detention facilities in California, to include Otay-Mesa.[80]

158.   Overall, the review found that detained individuals often face highly restrictive and prison-like settings, including wearing prison-style clothing, spending up to 22 hours a day in their cells, with limited contact with their lawyers, inadequate medical and mental health care, and performing work for which they are often unpaid or compensated at $1.00 a day.[81]

http://www.aappublications.org/news/2018/04/02/pregnancyimmigration04 0218.

[79] U.S. Immigration and Customs Enforcement, "News Release from CBP and ICE on Stillbirth in Custody," February 25, 2019available at https://www.ice.gov/news/releases/joint-statement-ice-and-cbp-stillbirth-custody (last visited June 3, 2019).

[80] Leticia Miranda, *Dialing with Dollars: How County Jails Profit From Immigrant Detainees*, The Nation (May 15, 2014), https://www.thenation.com/article/dialing-dollars-how-county-jails-profit-immigrant-detainees/.

[81] *Id.* at iii–iv, 78, 122–27.

## X.      Ms. Morales-Alfaro Lands in the Clutches of ICE and CoreCivic.

159.    While travelling from El Salvador to the United States, Ms. Morales-Alfaro learned that she was pregnant.

160.    Ms. Morales-Alfaro presented to the United States Customs and Border Protection officers seeking asylum on or about December 24, 2017.

161.    A CBP officer that is yet to be identified, kicked Ms. Morales-Alfaro in the belly and the back.  When Ms. Morales-Alfaro told the officer that she was pregnant, the officer stated, "That's not my problem."

162.    Ms. Morales-Alfaro initially was housed at an CBP detention facility, which she believes near the United States-Mexico border.

163.    In that first facility, Ms. Morales-Alfaro also was subjected to inhumanely cold temperatures and no medical care.

164.    Her description is consistent with the findings of at least one non-governmental agency, that women and children are often held at these initial detention facilities in rooms the DHS employees call "hielaras" – Spanish for "freezers."[82]

---

[82] Human Rights Watch, "In the Freezer: Abusive Conditions for Women and Children in U.S. Immigration Holding Cells," February 28, 2018, available at https://www.hrw.org/report/2018/02/28/freezer/abusive-conditions-women-and-children-us-immigration-holding-cells (last visited January 10, 2020).

165.    The intentional manipulation of temperatures by Border Patrol officials as a form of abuse was documented by the humanitarian aid organization No More Deaths ("NMD") in 2011.[83]

166.    After two to three days at the first detention center, Ms. Morales-Alfaro was transferred to the Otay-Mesa ICE detention center.

167.    The Otay-Mesa ICE facility was kept very cold, though not as cold as the first processing center.

168.    Detainees were not given blankets -- just "silver paper."

169.    Ms. Morales-Alfaro describes the "silver paper" to sound like the coverings seen in news footage of the immigrant detention centers.

170.    The cold temperatures made sleep impossible, further endangering Ms. Morales-Alfaro's pregnancy.

*A.    Ms. Morales-Alfaro's Prenatal Care (or Lack Thereof) While Detained.*

171.    In an initial ICE medical intake Ms. Morales-Alfaro also stated to a nurse on December 24, 2018 was detained, "I'm pregnant and I feel real bad. Five months ago I had a miscarriage.  I can't eat and I feel sick to my stomach all the time.  I think I need iron pills and vitamins."

[83] *Culture of Cruelty: Abuse & Impunity In Short-Term U.S. Border Patrol Custody*, No More Deaths (2011), *available at* http://forms.nomoredeaths.org/abuse-documentation/a-culture-of-cruelty/appendix- official-documents/ (noting reports of agents "turning on the air conditioning or placing fans outside the cells after receiving complaints about cold cells") (hereafter "*Culture of Cruelty*").

172.   On or about January 2, 2018, Ms. Morales reported to one of the guards that she was bleeding and pain.

173.   She asked the CoreCivic guard for medical assistance.

174.   The first guard she told in the morning told her she'd have to wait.

175.   She then told another guard on the afternoon shift that she was bleeding and feeling more pain.

176.   That guard also told her to wait.

177.   The next day, the guards allowed Ms. Morales-Alfaro to see the nurse.

178.   The nurse sent Ms. Morales-Alfaro back to her pod in the facility with Tylenol.

179.   Rosenblatt gave Ms. Morales no sanitary supplies to address the bleeding.

180.   CoreCivic did not give Ms. Morales-Alfaro sanitary supplies to deal with the bleeding.

181.   The facility charges $1 a piece for sanitary supplies.

182.   Despite Ms. Morales telling guards each day for the ensuing week that her bleeding and pain were getting worse, and despite, with those reports to the guards, asking to be allowed to go to medical, the CoreCivic guards refused to allow Ms. Morales-Alfaro to return to medical.

183.   The next time Ms. Morales received any medical care, despite her daily requests, was approximately two weeks later, when, on or about January 10,

2018, she collapsed and was transported to a doctor, who determined that the baby was not viable.

184. On or about January 15, 2018, Ms. Morales-Alfaro was transported to a hospital, due to continued bleeding, after reporting the bleeding and pain for at least five days.

185. Hospital staff told Ms. Morales-Alfaro that the miscarriage could have been avoided, if she had been seen by a doctor sooner.

186. Ms. Morales-Alfaro was placed in restraints at the wrists and ankles both at the hospital and during her transport to and from the hospital -- in direct violation of ICE's policies regarding restraints on pregnant women.

*B.*     *Ms. Morales-Alfaro's Prenatal Diet (or Lack Thereof) While Detained.*

187. The American College of Obstetrics and Gynecology has published the following nutritional guidelines for pregnant women:

> [The recommended food groups are]
>
> 1.     Grains—Bread, pasta, oatmeal, cereal, and tortillas are all grains.
>
> 2.     Fruits—Fruits can be fresh, canned, frozen, or dried. Juice that is 100% fruit juice also counts.
>
> 3.     Vegetables—Vegetables can be raw or cooked, frozen, canned, dried, or 100% vegetable juice.
>
> 4.     Protein foods—Protein foods include meat, poultry, seafood, beans and peas, eggs, processed soy products, nuts, and seeds.
>
> 5.     Dairy—Milk and products made from milk, such as cheese, yogurt, and ice cream, make up the dairy group.
>
> . . .

During pregnancy, the fats that you eat provide energy and help build many fetal organs and the placenta. Most of the fats and oils in your diet should come from plant sources. Limit solid fats, such as those from animal sources. Solid fats also can be found in processed foods.

. . . .

Vitamins and minerals play important roles in all of your body functions. During pregnancy, you need more folic acid and iron than a woman who is not pregnant.

. . . .

Before pregnancy and during pregnancy, you need 400 micrograms of folic acid daily to help prevent major birth defects of the fetal brain and spine called neural tube defects. Current dietary guidelines recommend that pregnant women get at least 600 micrograms of folic acid daily from all sources. It may be hard to get the recommended amount of folic acid from food alone. For this reason, all pregnant women and all women who may become pregnant should take a daily vitamin supplement that contains folic acid.

. . . .

Iron is used by your body to make a substance in red blood cells that carries oxygen to your organs and tissues. During pregnancy, you need extra iron—about double the amount that a nonpregnant woman needs. This extra iron helps your body make more blood to supply oxygen to your fetus. The daily recommended dose of iron during pregnancy is 27 mg, which is found in most prenatal vitamin supplements.  You also can eat iron-rich foods, including lean red meat, poultry, fish, dried beans and peas, iron-fortified cereals, and prune juice. Iron also can be absorbed more easily if iron-rich foods are eaten with vitamin C-rich foods, such as citrus fruits and tomatoes.

. . . .

Calcium is used to build your fetus's bones and teeth.  All women, including pregnant women, aged 19 years and older should get 1,000 mg of calcium daily; those aged 14–18 years should get 1,300 mg daily. Milk and other dairy products, such as cheese and yogurt, are the best sources of calcium.  If you have trouble digesting milk products, you can

get calcium from other sources, such as broccoli; dark, leafy greens; sardines; or a calcium supplement.

. . . .

Vitamin D works with calcium to help the fetus's bones and teeth develop. It also is essential for healthy skin and eyesight. All women, including those who are pregnant, need 600 international units of vitamin D a day. Good sources are milk fortified with vitamin D and fatty fish such as salmon.  Exposure to sunlight also converts a chemical in the skin to vitamin D.

188.   Ms. Morales and the other detainees, to include the several other pregnant women housed with her, received no fresh fruit and no fresh vegetables.

189.   The food she did receive was nearly inedible and full of starch filler.

190.   The nutritionally deficient – and inedible – food at the initial CBP facility and CoreCivic's Otay-Mesa Facility also contributed to Ms. Morales-Alfaro's miscarriage.[84]

[84]  See, e.g. Rahimeh Ahmadi, M.Sc., Saeideh Ziaei, M.D., and Sosan Parsay, Ph.D.," Association between Nutritional Status with Spontaneous Abortion," *International Journal of Fertility and Sterility*, Jan. – Mar. 2017,vol. 10.4, at 337.42, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5134748/ (last visited January 9, 2020).

**PLAINTIFF'S CAUSES OF ACTION AGAINST DEFENDANTS**

**COUNT ONE**
**VIOLATION OF PLAINTIFF'S FIFTH AND FOURTEENTH AMENDMENT RIGHTS**
**(Deliberate Indifference to Serious Medical Needs)**

191.   Ms. Morales-Alfaro re-alleges each and every paragraph, *supra*, as if fully alleged herein.

192.   At all relevant times, all Defendants were federal actors and were acting under color of federal law.

193.   Plaintiff had a substantive liberty interest under the Due Process Clause in receiving adequate health care while in the custody of the Defendants named in this claim.

194.   Defendants, in denying Ms. Morales-Alfaro medical care for approximately two weeks, after she began showing symptoms of fetal distress, were deliberately indifferent to the serious risk of substantial harm and injury to her.

195.   Defendants' deliberate indifference to Ms. Morales-Alfaro's serious medical needs are consistent with the Defendants' demonstrated policy and practice of deliberate indifference to the serious medical needs of detained asylum seekers.

196.   Delays and denial of medical and mental health care have been cited repeatedly in government reviews documenting detained individuals' deaths,

in the government's own reporting on Defendants' Detention Facility network, and in non-governmental organization reporting.

197.    Despite these reports, Defendants have taken no effective steps to eliminate or mitigate the delays and denial of care.

198.    The failure of the Defendants named in this claim to provide adequate health care violated substantive due process because it furthered no legitimate purpose, let alone a compelling one.

199.    The Defendants named in this claim have developed, adopted, implemented, enforced, sanctioned, encouraged, condoned, and acquiesced to a pattern, practice, or custom of violating the Plaintiff's clearly established Fifth Amendment due process, by failing to provide adequate health care to Plaintiffs while in custody.

200.    Their failure to remedy known dangers to detainees created by the Defendants constitutes deliberate indifference to the serious medical needs of immigrants in ICE detention.

201.    Here, the Defendants' deliberate indifference to Ms. Morales-Alfaro's serious medical needs contributed to her miscarriage.

202.    Ms. Morales-Alfaro asks this Court to enter an order granting injunctive and declaratory relief as to this Count.

**COUNT TWO**
**VIOLATIONS OF THE FIFTH AND FOURTEENTH AMENDMENT RIGHTS**
**(Punitive Civil Detention Conditions)**
**(All Defendants)**

203.   Ms. Morales-Alfaro re-alleges each and every paragraph, *supra*, as if fully alleged herein.

204.   At all relevant times, all Defendants were federal actors and were acting under color of federal law.

205.   Plaintiff has a substantive liberty interest under the Due Process Clause in not being subjected to punitive treatment without due process.

206.   If a civil detainee is confined in conditions that are identical to, similar to, or more restrictive than those under which pre-trial detainees or convicted prisoners are held, then those conditions are presumptively punitive and unconstitutional.[88]

207.   Here, Ms. Morales-Alfaro and thousands of other detainees have been subject to brutal, punitive conditions, to include, but not be limited to:  strict limits on access to the outdoors and sunshine;  freezing cold holding cells and detainee pods;  the lack of blankets in those freezing temperatures, which prohibits the detainees from sleeping;  the denial of edible food and proper

[88] *Youngberg v. Romeo*, 457 U.S. 307, 321–22, (1982);  see also *King v. Cty. of Los Angeles*, 885 F.3d 548, 552 (9th Cir. 2018) (finding presumption of punitive and unconstitutional treatment where conditions of confinement for civil detainees are similar to those faced by pre-trial criminal detainees);  *Sharp v. Weston*, 233 F.3d 1166, 1172–73(9th Cir. 2000) (finding that *Youngberg* required that individuals civilly confined at a commitment center receive "more considerate" treatment than inmates at the correctional center in which the commitment center was located).

nutrition; delay and denial of medical care; and delay and denial of feminine hygiene products; and shackling pregnant women.

208. The treatment inflicted by Defendants on Plaintiff served no legitimate purpose.

209. Defendants have developed, adopted, implemented, enforced, sanctioned, encouraged, condoned, and acquiesced to a pattern, practice, or custom of inflicting punishment on Plaintiff, in violation of the Fifth Amendment.

210. Defendants' conduct shocks the conscience, interferes with rights implicit in the concept of ordered liberty, and demonstrates their deliberate indifference to the violation of Plaintiffs' and Class Members' constitutional right to due process.

211. These punishing conditions constitute violations of the Fifth and Fourteenth Amendments and injury, in and of itself, to Ms. Morales-Alfaro.

212. Ms. Morales-Alfaro asks this Court to enter an order granting injunctive and declaratory relief as to this Count.

## COUNT THREE
### VIOLATIONS OF THE FIFTH AND FOURTEENTH AMENDMENT
### (Discrimination Based Upon Nationality and Ethnicity)
### (All Defendants)

213. Ms. Morales-Alfaro re-alleges each and every paragraph, *supra*, as if fully alleged herein.

214.   At all relevant times, all Defendants were federal actors and were acting under color of federal law.

215.   The Fifth and Fourteenth Amendments of the U.S. Constitution protect all individuals from the government denying equal protection of the law.

216.   Per the policy statements of the current President and the DHS leadership, ICE detention's punitive conditions, to include those in the Otay-Mesa facility, are intended to impact immigrants from Mexico and Central America, to include immigrants from El Salvador.

217.   Ms. Morales-Alfaro asks this Court to enter an order granting injunctive and declaratory relief as to this Count.

**COUNT FOUR**
**Violations of the Administrative Procedure Act**
**Agency Action Unlawfully Withheld**
**(United States)**

218.   Ms. Morales-Alfaro re-alleges each and every paragraph, *supra*, as if fully alleged herein.

219.   The Administrative Procedure Act ("APA"), 5 U.S.C. § 706(1), requires a court to "compel agency action unlawfully withheld or unreasonably delayed."

220.   DHS has promulgated extensive policies and procedures in the Performance-Based National Detention Standards and elsewhere related to the operation of detention facilities, including the as the provision of food, water, hygiene products, shackling of pregnant women, sleep, and medical care.

221.   DHS has failed to enforce those procedures.

222.   DHS' failure to enforce constitutes final agency action.

223.   Plaintiff suffered legal wrongs and has been adversely affected and aggrieved by DHS' failure to act.

224.   Ms. Morales-Alfaro asks this Court to enter an order granting injunctive and declaratory relief as to this Count.

**COUNT FIVE**
**VIOLATIONS OF SECT. 504 of the REHABILITATION ACT**
**29 U.S.C. 794, et. seq.**
**(Defendants United States and CoreCivic)**

226.   Ms. Morales-Alfaro re-alleges each and every paragraph, *supra*, as if fully alleged herein.

227.   The provision of timely health care, compliance with ICE's own detention standards, and compliance with the United States constitution are the United States' non-delegable duties.

228.   CoreCivic, through its contractual relationship with the United States, shares those duties.

229.   The Defendants' demonstrated pattern and practice of failing to provide proper, timely medical care to women presenting high risk pregnancies and symptoms of fetal distress, constitutes a failure to deliver services to those with special medical needs, in violation of Sect. 504 Rehabilitation Act.

230.   Ms. Morales-Alfaro asks this Court to enter an order granting injunctive and declaratory relief as to the United States.

231.   Ms. Morales-Alfaro asks this Court to enter an order granting injunctive and declaratory relief and for economic damages as to CoreCivic.

## COUNT SIX
## NEGLIGENCE
## (All Defendants)

232.   Ms. Morales-Alfaro re-alleges each and every paragraph, *supra*, as if fully alleged herein.

233.   Ms. Morales-Alfaro was at the complete mercy of CoreCivic's employees to receive food, clothing, bedding, sanitary supplies, and medical care and access to the outdoors and sunshine.

234.   Throughout her detention at the CoreCivic Otay-Mesa facility, CoreCivic employees, breached their duties to her, by, and without limitation:  requiring her to wear prison garb;  shackling a women it knew was pregnant;  providing her only inedible food;  creating conditions so cold and not providing a blanket, so that she could not sleep;  denying her basic feminine hygiene products;  delaying and denying her access to medical providers;  and denying her access to the outdoors and sunshine.

235.   As discussed above, the United States has been repeatedly warned about CoreCivic's incompetence in running immigration facilities throughout the United States.

236.   The United States has been put on notice repeatedly about CoreCivic's repeated failures regarding inmate health care, Constitutional violations, and abhorrent conditions at the Otay-Mesa ICE facility.

237.   The United States has been negligent in entering into contracts with CoreCivic to manage its immigration detention facilities.

238.   The United States has been negligent in monitoring CoreCivic's honoring its obligations under those contracts.

239.   The repeated breaches of these duties contributed to Ms. Morales-Alfaro's miscarriage.

240.   The provision of timely health care, compliance with ICE's own detention standards, and compliance with the United States constitution are non-delegable duties.

241.   The United States' abject failure to supervise its contractor at the Otay-Mesa facility resulted in inhumane conditions to include frigid cold temperatures, a denial of basic hygiene products, nutritionally deficient food, shackling of pregnant women, and delay and denial of critical medical care.

242.   As a result, Ms. Morales-Alfaro – and thousands of other civil detainees – have suffered. The United States' negligent supervision and its failure to meet its own non-delegable duties contributed to Ms. Morales-Alfaro's damages.

243.   The repeated breaches of these duties also caused Ms. Morales pain, suffering, and emotional distress.

244.   Ms. Morales-Alfaro seeks compensatory and punitive damages for her losses pertaining to this Count.

## COUNT SEVEN
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (Defendant CoreCivic)

245.   Ms. Morales-Alfaro re-alleges each and every paragraph, *supra*, as if fully alleged herein.

246.   The CoreCivic's negligence directly contributed to or was a proximate cause of the miscarriage of Ms. Morales-Alfaro's baby.

247.   This lost pregnancy caused her the kind of suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation, and shame, with which no reasonable person would be able to cope.

248.   Ms. Morales-Alfaro seeks compensatory and punitive damages for her losses pertaining to this Count.

## COUNT EIGHT
### NEGLIGENT SUPERVISION AND TRAINING OF EMPLOYEES
### (Defendant CoreCivic)

249.   Ms. Morales-Alfaro re-alleges each and every paragraph, *supra*, as if fully alleged herein.

250.   The CoreCivic employees' conduct, described *supra*, was the direct and proximate result of CoreCivic's abject failure to properly supervise and train its corrections officers.

251.   CoreCivic knew or should have known that its employees at the Otay-Mesa facility (and its other ICE detention facilities) were repeatedly failing in their duties to detained asylum seekers.

252. CoreCivic knew or should have known about the scores of DHS Office of Inspector General investigations, Congressional investigations, non-governmental organization investigations, prior lawsuits, and its own internal reviews that conditions in its ICE detention centers were not only substandard, but also barbaric.

253. CoreCivic's repeated failures to correct these deficiencies make it liable for the negligent supervision and training of its employees at the Otay-Mesa facility.

254. Ms. Morales-Alfaro seeks compensatory and punitive damages for her losses pertaining to this Count.

**COUNT NINE**
***RESPONDEAT SUPERIOR* LIABILITY**
**(Defendant CoreCivic)**

255. Ms. Morales-Alfaro re-alleges each and every paragraph, *supra*, as if fully alleged herein.

256. The conduct of CoreCivic employees, described *supra*, occurred at the Otay-Mesa facility, by CoreCivic employees, while they were acting within the ordinary scope of their employment.  As such, CoreCivic is responsible for Mr. Morales-Alfaro's injuries under the *respondeat superior* doctrine.

257. Ms. Morales-Alfaro seeks compensatory and punitive damages for her losses pertaining to this Count.

## COUNT TEN
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (Defendant United States)

258.   Ms. Morales-Alfaro re-alleges each and every paragraph, *supra*, as if fully alleged herein.

259.    United States has been repeatedly warned about CoreCivic's incompetence in running immigration facilities throughout the United States.

260.   The United States has been put on notice repeatedly about CoreCivic's repeated failures regarding inmate health care, inmate hygiene, Constitutional violations, and abhorrent conditions at the Otay-Mesa ICE facility.

261.   The United States has been negligent in entering into and administering contracts with CoreCivic to manage its immigration detention facilities.

262.   It further has been negligent in monitoring CoreCivic's honoring its obligations under those contracts.

263.   The provision of timely health care, compliance with ICE's own detention standards, and compliance with the United States constitution are non-delegable duties.

264.   Here, the United States' failure to supervise its contractor at the Otay-Mesa facility resulted in inhumane conditions to include frigid cold temperatures, nutritionally deficient food, shackling of pregnant women, and delay and denial of critical medical care.

265.   As a result, Ms. Morales-Alfaro – and thousands of other civil detainees – have suffered. The United States' negligent supervision and its failure to

meet its own non-delegable duties contributed to Ms. Morales-Alfaro's damages.

266.   Prison guards certainly cannot be relied upon to deny access to a medical provider.

267.   As in the several cases cited above, in which CoreCivic/CCA guards ignored pregnant women's pleas for help, these guards were not qualified to make these determinations.

268.   The United States has known for years that CoreCivic/CCA has an ongoing practice of leaving it up to guards to decide when a pregnant woman receives medical care – with deadly results.

269.   The United States' failure to supervise the conditions at facilities with hires CoreCivic to manage for it, despite several non- governmental organizations, the State of California, and its own inspector general finding that its supervision of CoreCivic is lax constitutes, most charitably, negligence.

270.   Ms. Morales-Alfaro seeks compensatory and punitive damages for her losses pertaining to this Count.

**COUNT ELEVEN**
**NEGLIGENT SUPERVISION OF EMPLOYEES**
**(Defendant United States)**

271.   Ms. Morales-Alfaro re-alleges each and every paragraph, *supra*, as if fully alleged herein.

272.   The conduct of DHS employees, described *supra*, occurred at the Otay-Mesa facility, by DHS employees, while they were acting within the ordinary scope of their employment.

273.   As such, Defendant United States is responsible for Ms. Morales-Alfaro's injuries under the *respondeat superior* doctrine.

274.   Ms. Morales-Alfaro seeks compensatory and punitive damages for her losses pertaining to this Count.

## PLAINTIFF'S DAMAGES AND PRAYER FOR RELIEF

275.   WHEREFORE, the Plaintiff prays this court award of judgment against the Defendants for the above-described violations of her constitutional rights and breaches of duty to her, without limitation, as follows:

276.   In favor of the Plaintiff, and against the above-named Defendants, joint and severally, for compensatory and special damages, in an amount which will fairly and reasonably compensate her for the violation of her constitutional rights;  her past and future medical care;  for her past and future pain and suffering, and disability;  and for as set forth above, in an amount to be determined by a jury at trial in this matter.

277.   For punitive damages in favor of the Plaintiff and against the Defendants.

278.   For injunctive and other equitable relief, reforming the Defendants' policies, practices and procedures to prevent like actions and harms in the future.

279.   For all costs, disbursement and attorney fees, and for other such relief as the Court deems just and reliable.

280.   WHEREFORE, Plaintiff requests this Court to enter a Judgment in her favor for all of the above-listed relief and any such other relief as may be just and proper.  Ms. Morales-Alfaro further seeks appropriate discipline or termination for all responsible officials and all other relief available, for which she qualifies.

### PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY

Respectfully submitted this Eighth day of June, 2020.

s/Joy Bertrand
Joy Bertrand
Attorney for Plaintiff

**CERTIFICATE OF SERVICE**

I, Joy Bertrand, do certify that on June 8, 2020, I filed the foregoing with the Southern District of California's ECF system. Based on my training and experience with electronic filing in the federal courts, I believe that a copy of the foregoing will be served upon CoreCivic's Counsel of Record via electronic mail upon its submission to the Court. I also will serve via email the AUSA, whom I believe to be assigned to this matter, Samuel Bettwy, at Samuel.Bettwy@usdoj.gov.

Submitted this Eighth day of June, 2020.

s/Joy Bertrand
Attorney for the Plaintiff