UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUBIA MABEL MORALES-ALFARO<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA, et al.,<br><br>Defendants. | Case No.: 3:20-cv-00082-LAB (BGS)<br><br>**ORDER RE:**<br><br>**1) CORECIVIC'S MOTION TO EXCLUDE THE EXPERT TESTIMONY OF NOAH AR NATTELL, M.D. [Dkt. 94]; AND**<br><br>**2) MOTIONS FOR SUMMARY JUDGMENT [Dkt. 92, 95, 99].** |

Plaintiff Rubia Mabel Morales-Alfaro ("Morales"), an asylum seeker from El Salvador, filed suit against Defendants CoreCivic, Inc. ("CoreCivic") and the United States of America ("United States") for claims stemming from the miscarriage she suffered on or about January 15, 2018, while in immigration custody. Morales claims that, but for Defendants' negligence in denying her adequate care, she would not have miscarried. She maintains that Defendants' actions follow a pattern and practice of denying asylum seekers adequate medical care during their detention in an effort to deter them from coming to the United States.

The parties have each filed separate motions for summary judgment.

(Dkt. 92, 95, 99). CoreCivic has additionally filed a motion to exclude the testimony of Morales's expert, Noah AR Nattell. (Dkt. 94). Having carefully read and considered all materials in support of and in opposition to the respective motions, the Court rules as follows.

## I. UNDISPUTED MATERIAL FACTS[1]

Morales is a native and citizen of El Salvador. (Dkt. 91, Joint Statement of Undisputed Facts ("JSUF") ¶ 2). Prior to her travel to and entry into the United States in 2017, she had at least two pregnancies—once in 2006, following which she gave birth to a healthy daughter without complication, and another between late 2016 and January 2017, when she suffered a miscarriage during the first trimester of her pregnancy. (*Id*. ¶¶ 4–6).

In March 2017, Morales and her partner, Miguel Hernandez, left El Salvador and headed to the United States, traveling through Guatemala and Mexico. (*Id*. ¶ 7). Near the end of June 2017, they arrived in Tijuana, Mexico, where they stayed and worked until December 21, 2017. (*Id*. ¶ 8). While in Tijuana, Morales became pregnant for a third time. (*Id*. ¶ 9). On or about December 13, 2017, she confirmed her pregnancy with a pregnancy test at a medical clinic in Tijuana. (*Id*. ¶ 10). Then, on December 14, 2017, Dr. Sergio Mendez Ochoa at the Tijuana medical clinic performed an obstetric ultrasound, reporting a gestational sac of 8–13 mm in the uterine fundus and a 2 mm fetal pole. (*Id*. ¶ 12). His report noted that "measurements show 4 week pregnancy with no alterations," and identified August 22, 2018, as the full-term birth date. (*Id*. ¶¶ 11–13). Dr. Mendez Ochoa recommended that Morales come back in four weeks or sooner for a follow-up visit given that she'd suffered a miscarriage eight months prior. (*Id*. ¶ 14). Other than her visit to the Tijuana medical clinic and taking prenatal vitamins, Morales

---

[1] All facts referred to in this section and throughout the Order are undisputed, unless otherwise noted.

didn't receive any prenatal care in Tijuana. (*Id*. ¶ 15).

On the evening of December 21, 2017, Morales and Hernandez unlawfully entered the United States through a hole in the border wall on the Tijuana/San Diego border. (*Id*. ¶ 16). Morales carried only a backpack containing some personal items, which did not include prenatal vitamins. (*Id*. ¶ 18). She wore a thin top, sweater, thin leggings, a hat, shoes, and socks, despite the cold temperatures that night. (*Id*.). Morales was aware her journey would be "risky" and that she'd eventually be arrested, but she thought she would be provided with medical care in the United States and would be quickly released after her arrest. (*Id*. ¶ 20). She expected to be able to travel by bus to live with her sister in Kansas. (*Id*. ¶ 20).

Approximately ten minutes after crossing the border, Morales was apprehended by two U.S. Border Patrol agents and taken to a Border Patrol station, where she was detained for approximately two days. (*Id*. ¶¶ 21–22).[2] On December 24, 2017, Morales was transferred to Otay Mesa Detention Center ("OMDC"), a minimum security detention facility for U.S. Immigration and Customs Enforcement ("ICE") and Marshals Service ("USMS") detainees. (*Id*. ¶¶ 23–24). At OMDC, she was housed in Alpha Pod, a dorm-style pod housing up to 128 low-custody female detainees. (*Id*. ¶ 56). She was assigned to a bottom bunk in a room at the bottom tier of the pod because she was pregnant. (*Id*. ¶ 58). She was also provided with three sets of clothing, shoes, outerwear, bedding, blankets, linens, a mattress, pillow, and hygiene kit. (*Id*. ¶ 63). At OMDC, detainees had access to the facility's commissary where they could purchase various items, including food. (*Id*. ¶ 68). For instance, between December 28, 2017 and

---

[2] Morales separately alleges in her complaint and testified at her deposition that upon her apprehension at the border, a U.S. Border Patrol agent kicked her "[o]n [her] hip" and "in the back." (Dkt. 50, Fourth Amended Complaint ("4AC") ¶ 143; Dkt. 117-8 at 57:7–25). The United States denies this allegation and notes that Morales had never made a claim based on such an allegation. (Dkt. 92 at 8 n.3).

January 4, 2018, Morales purchased food items like ramen noodles, M&Ms, Oreos, hot chocolate, oatmeal, and Pepsi. (*Id*. ¶ 69).

Morales, like other pregnant detainees, was placed on a "pregnancy diet," meaning she received extra food with her meals to meet her required caloric intake. (*Id*. ¶¶ 70–71). All detainees had access to medical, dental, and mental health care provided by ICE Health Services Corps ("IHSC"), and detainees could request such care through the "sick call" process." (*Id*. ¶¶ 74–76). Morales received medical care at various times during her detention, including on December 28, 2017, January 10, 2018, and January 15, 2018. (*Id*. ¶¶ 106–08). On the latter date, security personnel in the dining hall called a medical emergency and Morales was transported offsite to the emergency room at Sharp Chula Vista for a suction dilation and curettage ("D&C") procedure. (*Id*. ¶¶ 108–10). The next day, on January 16, 2018, Morales passed a large blood clot, and an ultrasound confirmed she was no longer pregnant. (*Id*. ¶¶ 111). As a result, her D&C procedure was cancelled. (*Id*.).

In her Fourth Amended Complaint ("4AC"), Morales claims that the conditions at OMDC are deliberately punitive, and that Defendants "have colluded in instituting and implementing policies that are designed to inflict severe harm on Central American immigrants" in an effort to deter them from coming to the United States. (4AC at ¶¶ 2–3). She seeks to hold Defendants liable for their negligent behavior, which she alleges resulted in her miscarriage. Her 4AC alleges five causes of action: one claim under the Federal Tort Claims Act ("FTCA") against the United States, and four negligence-based claims under California state law against CoreCivic.

## II.   EVIDENTIARY OBJECTIONS

CoreCivic has filed two motions to exclude expert testimony under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589 (1993). (Dkt. 93, 94). Under the *Daubert* standard, "the trial judge must

ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589. Rule 702 permits the introduction of expert testimony only if: (1) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," (2) "the testimony is based on sufficient facts or data," (3) "the testimony is the product of reliable principles and methods," and (4) "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. The proponent of the expert testimony has the burden of proving the proposed testimony is admissible. *Lust ex rel. Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996). "Although the district court must perform a gatekeeping function, a trial court 'not only has broad latitude in determining whether an expert's testimony is reliable, but also in deciding *how* to determine the testimony's reliability.'" *United States v. Gadson*, 763 F.3d 1189, 1202 (9th Cir. 2014) (citation omitted) (emphasis in original); *see also Daubert*, 509 U.S. at 597.

Because the Court has only considered the testimony of one of the contested experts in deciding the parties' respective motions for summary judgment, the Court will presently only decide CoreCivic's motion to exclude the expert testimony of Dr. Noah AR Nattell. (Dkt. 94).

### A. Motion to Exclude Dr. Noah AR Nattell, MD

CoreCivic argues that certain of Dr. Nattell's opinions should be excluded because they are both improper and unreliable. CoreCivic first contends that Dr. Nattell's opinions are not the proper subjects of rebuttal, but rather "go to the heart of Plaintiffs' case and the central question to be decided by the jury—did CoreCivic's actions/inactions cause Plaintiff's miscarriage?" (Dkt. 93 at 5). Given that Dr. Nattell discusses the factors contributing to Morales's miscarriage and whether her pregnancy was viable prior to detention, CoreCivic maintains that Morales should have offered such opinions in her case-in-chief, not in a rebuttal

report. (*Id*.).

Dr. Nattell's expert report was filed in response to CoreCivic's motion for summary judgment. (Dkt. 117). In his report, he offers an analysis of Morales's ultrasounds and her pregnancy health, and he also opines on the circumstances surrounding her detainment at OMDC and how this may have affected her pregnancy. Although rebuttal testimony may not present "new facts" or "novel argument," *LaFlamme v. Safeway, Inc.*, No. 09-cv-514-ECR-VPC, 2010 WL 3522378, at *8 (D. Nev. Sept 2, 2010), none of that is actually presented here— only alternative explanations to opinions offered on the same subject matter by Defendants' expert, Dr. Jessica M. Kingston. Just because Morales could have designated Dr. Nattell as an expert in the first place doesn't mean the evidence may not be introduced as rebuttal evidence if it refutes the subject matter of Defendants' expert witness testimony. *Hellmann-Blumberg v. Univ. of Pac.*, No. 12-CV-00286-TLN-DAD, 2013 WL 3422699, at *5 (E.D. Cal. July 8, 2013) ("[A]lthough [Plaintiff] could have used the proposed expert testimony . . . in support of its affirmative defenses, the same testimony may be introduced as rebuttal testimony if it refutes the subject matter of [Defendant]'s expert witness testimony.").

As for whether the opinions rendered by Dr. Nattell are reliable, CoreCivic's arguments go to the weight of Dr. Nattell's testimony, not its admissibility. CoreCivic asks the Court to decide that Dr. Nattell's opinions are wrong, but that isn't part of the Court's gatekeeping function. *See Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013); *see also Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 814 (9th Cir. 2014) (quoting *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010)) ("The test 'is not the correctness of the expert's conclusions but the soundness of his methodology,' and when an expert meets the threshold established by Rule 702, the expert may testify and the fact finder decides how much weight to give that testimony."). "Shaky but

admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564; *see also Daubert*, 509 U.S. at 595–96. CoreCivic's request to exclude Dr. Nattell's testimony is **DENIED**.

### III.   SUMMARY JUDGMENT

#### A. Legal Standard

Summary judgment is appropriate under Federal Rule of Civil Procedure 56(a) where the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial." *Id.* at 324. The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

On summary judgment, the Court draws all reasonable factual inferences in favor of the non-movant. *Id.* at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* (citation omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 242. The Court does not make credibility determinations or weigh conflicting evidence. *Id.*, 477 U.S. at 255. Rather, the Court determines whether the record "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

### B. Claim Against the United States

Morales asserts her only federal claim in this case against the United States—medical negligence brought under the FTCA, 28 U.S.C. § 1346. She claims that the United States "is responsible for the acts and omissions of health care providers acting within the scope and course of their employment with ICE Health Services Corps, including employees involved in the care and treatment of Ms. Morales-Alfaro." (4AC ¶ 201). She argues that the United States owed her a duty "to act as reasonably prudent health care providers acting under the same or similar circumstances," (*id.* ¶ 202), but that it failed to provide her with timely, effective medical care while she was detained at OMDC, (*id.* ¶¶ 198–201). She maintains that the United States harmed her in two ways: (1) the United States' medical negligence was a substantial factor in causing her miscarriage, and (2) the United States' medical negligence caused her unnecessary suffering. (Dkt. 118 at 22).

### i. The FTCA

The FTCA permits a plaintiff to pursue tort claims, including medical negligence, against the United States. 28 U.S.C. §§ 1346(b), 2671. "The FTCA authorizes private tort actions against the United States 'under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.'" *Jachetta v. United States*, 653 F.3d 898, 904 (9th Cir. 2011) (quoting 28 U.S.C. § 1346(b)(1)). Accordingly, "the extent of the United States' liability under the FTCA is generally determined by reference to state law." *Liebsack v. United States*, 731 F.3d 850, 855 (9th Cir. 2013) (quoting *Molzof v. United States*, 502 U.S. 301, 305 (1992)); *see also* 28 U.S.C. § 2674.

To prevail on a medical malpractice claim under California law, the plaintiff must establish: "(1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise;

(2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence." *Tortorella v. Castro*, 140 Cal. App. 4th 1, 3 n.2 (2006). "Because the standard of care in a medical malpractice case is a matter 'peculiarly within the knowledge of experts,' expert testimony is required to prove or disprove that the defendant performed in accordance with the standard of care unless the negligence is obvious to a layperson." *Johnson v. Super. Ct.*, 143 Cal. App. 4th 297, 305 (2006) (quoting *Sinz v. Owens*, 33 Cal. 2d 749, 753 (1949)).

Under California law, a plaintiff alleging medical malpractice "must prove the defendant's negligence was a cause-in-fact of injury." *Jennings v. Palomar Pomerado Health Sys., Inc.*, 114 Cal. App. 4th 1108, 1118 (2003). The showing must consist of more than mere speculation, as "proffering an expert opinion that there is some theoretical possibility the negligent act *could have been* a cause-in-fact of a particular injury is insufficient to establish causation." *Id*. (emphasis in original). However, California courts "do not require a heightened standard for causation in medical malpractice cases." *Uriell v. Regents of Univ. of Cal.*, 234 Cal. App. 4th 735, 746 (2015). "Instead, the plaintiff must offer an expert opinion that contains a reasoned explanation illuminating why the facts have convinced the expert, and therefore should convince the jury, that it is *more probable than not* the negligent act was a cause-in-fact of the plaintiff's injury." *Jennings*, 114 Cal. App. 4th at 1118 (emphasis in original); *see also Raven H. v. Gamette*, 157 Cal. App. 4th 1017, 1029 (2007) ("The fact of causation is incapable of mathematical proof, since no [person] can say with absolute certainty what would have occurred if the defendant had acted otherwise.") (quoting Rest. 2d Torts, § 433B, com. b). Accordingly, "[w]hether a defendant's conduct actually caused an injury is a question of fact that is ordinarily for the jury." *Id*. (quoting *Osborn v. Irwin Mem'l Blood Bank*, 5 Cal. App. 4th 234, 252 (1992)) (internal citations omitted).

### ii. Medical Negligence

The United States moves for summary judgment on the grounds that Morales cannot prove the causation element of her medical negligence claim because Morales's experts don't—and can't—offer any opinion that "delayed medical care or anything else that happened at the OMDC medical clinic caused her miscarriage." (Dkt. 92 at 9). The Government argues that Morales's pregnancy had already failed well before she reached the United States, as evidenced by the ultrasound taken at the Tijuana clinic on December 14, 2017. (*Id*.).

Specifically, the United States relies on the expert opinion of Dr. Jessica M. Kingston. Dr. Kingston is board-certified by the American Board of Obstetrics and Gynecology and is currently employed by UC San Diego Health as a Health Sciences Clinical Professor. (Dkt. 92-2, ¶¶ 6–8). Dr. Kingston explains that, in an ultrasound documenting a pregnancy, the gestational sac is the first structure seen by about 4 weeks gestation, followed by the yolk sac[3] by approximately 5 weeks gestation, the fetal pole by 6 weeks gestation, and fetal heart motion as early as 6 weeks and always by 7 weeks gestation. (*Id*. ¶ 40). Having reviewed the ultrasound report from Morales's December 14, 2017 visit to a medical clinic in Tijuana, she notes that the measurements of Morales's intrauterine gestational sac were reported as measuring between 8–13 mm, with the medical visit report concluding that measurements showed a 4-week pregnancy. (*Id*. ¶ 42). Dr. Kingston states that the medical visit report doesn't mention a yolk sac, nor can it be seen on the ultrasound images, and that the report likewise makes no mention of a fetal heartbeat, despite Morales's deposition testimony otherwise.

---

[3] Dr. Kingston additionally explains that "[a] yolk sac is a structure that develops inside the uterus during pregnancy and is essential to the formation of an embryo in that it provides necessary nutrients to the embryo during the first trimester, as well as other critical biological functions. The yolk sac (or lack thereof) serves as a significant predictor of adverse pregnancy outcomes." (*Id*. at 14 n.4).

(*Id*. ¶¶ 42, 46–47). She maintains that "[i]f the pregnancy was measuring at 4 weeks, no fetal heartbeat could possibly have been detected." (*Id*. ¶ 48). And, notably, although the report described a 2 mm fetal pole, Dr. Kingston states that this isn't actually visible on the ultrasound images. (*Id*. ¶ 42). She believes this is further confirmed because the medical visit report doesn't note the existence of a yolk sac, "which would have developed before the fetal pole in a normal pregnancy." (*Id*. ¶ 51).

She also suggests that although the ultrasound showed a pregnancy measuring at around 4–5 weeks gestation, Morales was actually 6 weeks and 3 days pregnant based on her last reported menstrual cycle, a discrepancy she believes could be indicative of early pregnancy loss. (*Id*. ¶¶ 44–45). Taking into account this discrepancy as to Morales's gestational age, Dr. Kingston concludes that, "to a reasonable degree of medical probability, Ms. Morales-Alfaro's clinical course and ultrasound studies demonstrate that the ultrasound performed on December 14, 2017 was indicative of early pregnancy failure and this was definitively confirmed when her second ultrasound was performed 4 weeks later on January 10, 2018." (*Id*. ¶ 59). She found that, "[o]n December 14, 2017, Ms. Morales-Alfaro's pregnancy should have measured at approximately 6 weeks, 3 days. Not only did she measure at only 4 weeks, but the ultrasound did not show an embryo, which is suspicious for impending pregnancy loss." (*Id*. ¶ 54). She states that the "discrepancy could be indicative of early pregnancy loss because it shows that the pregnancy was not developing as expected in accordance with the gestational age based on her [last menstrual period]." (*Id*. ¶ 45). Moreover, she states:

> Ms. Morales-Alfaro had a formal ultrasound 4 weeks later at Sharp Chula Vista Medical Center on January 10, 2017 when she was evaluated for vaginal bleeding. Based on the December 14, 2017 ultrasound, her gestational age was 8 weeks. However, the January 10, 2018 ultrasound

> performed at the hospital measured her pregnancy at only 6 weeks gestation and no fetal heartbeat was seen. Further, no yolk sac was seen on the January 10, 2018 ultrasound.

(*Id*. ¶ 54). She further notes that "[t]he fact that a yolk sac was never demonstrated on any ultrasound done for Ms. Morales-Alfaro is additional evidence of a failed pregnancy." (*Id*. ¶ 56).

Dr. Kingston found that the circumstances during Morales's detention that are cited as contributing to her miscarriage—including the use of restraints and being deprived of adequate nutrition, sunlight, feminine hygiene products, and adequate clothing—had no effect on her pregnancy. (*See e.g.*, *id*. ¶ 75 ("Ms. Morales-Alfaro's medical records document that a daily prenatal vitamin was prescribed, and there is no indication that Ms. Morales-Alfaro was not provided with regular meals."); *id*. ¶ 79 ("The availability of feminine hygiene products (or lack thereof) has no medical relation to pregnancy loss."); *id*. ("[T]he use of restraints, without more, would have had no effect on her pregnancy."); *id*. ¶ 80 ("There is no documented study showing that lack of sunlight or cold temperatures have any impact on pregnancy and/or pregnancy loss. . . . [To] impact a woman's pregnancy, [] these conditions would need to cause extreme, severe, and constant deprivation of necessary life-sustaining measures.")). Dr. Kingston concludes, "to a reasonable degree of medical probability, that Ms. Morales-Alfaro[] . . . was experiencing pregnancy failure prior to being apprehended by US Border Patrol agents on December 22, 2017," (*id*. ¶ 61), and nothing could have been done by clinicians at OMDC to prevent her pregnancy loss, (*id*. ¶ 88 ("Even though clinicians at OMDC were aware of Ms. Morales-Alfaro's symptoms and her concern for miscarriage, there are no medical or surgical interventions that could or would have prevented her pregnancy loss.")).

In response, Morales argues that during her immigration custody, beginning with the moment she first presented herself to Border Patrol agents, she

consistently expressed that she was pregnant, she'd been kicked by a Border Patrol agent, and she was in pain, and that medical staff failed to provide her with timely obstetric care, causing her nearly two weeks of unnecessary pain and suffering. (Dkt. 118 at 16). She explains that a physician's assistant who saw her at the OMDC clinic twice sent urgent requests that she be seen by an obstetrician, but none of those appointments ever happened. (*Id*. at 27). She argues that the "lack of care, combined with symptoms of a high risk pregnancy gave her pregnancy no chance." (*Id*.). And, notably, she concedes that "[w]hile early intervention *may* not have been able to prevent this miscarriage, the reality is that the United States provided *no* prenatal medical care, not to mention the specialty care mandated by the PBNDS and NCCHC." (*Id*. (emphasis in original)). She concludes that, "[e]ven if the Defendants could show no factual dispute about the causation of her miscarriage, which they cannot, the Defendants cannot account for letting Ms. Morales suffer for **twelve days**, while her miscarriage symptoms worsened." (*Id*. at 28 (emphasis in original)).

In its Reply, the United States points out that Morales attempts to carve out a new basis of harm, separate from the one seemingly alleged in her 4AC and throughout this case. (Dkt. 123 at 2 ("In this case, Ms. Morales' medical expert finds that this denial of basic prenatal care caused an injury distinct from the miscarriage.")). While the 4AC is threadbare as to the specific factual allegations supporting her medical negligence claim, (*see* 4AC ¶¶ 198–203), her fifth cause of action re-alleges and incorporates all previous allegations made in the complaint relating to Defendants' negligence as a direct and proximate cause of Morales's miscarriage. There is no indication, other than for the first time in her Opposition, that Morales's medical negligence claim is intended to hold the United States liable for injuries distinct from her miscarriage. Indeed, both the allegations in the 4AC and Morales's own deposition testimony indicate otherwise. (*See* Dkt. 117-8 at 146:5–7 ("BY MR. BETTWY: Q. So is -- is it the loss of your

baby that has caused you all of your trauma? A. Yes.")). Given this history, the Court declines to consider this new basis of liability. See *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) ("[T]he necessary factual averments are required with respect to each material element of the underlying legal theory. . . . Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings.") (internal citation and quotation marks omitted).

Second, as to the contested causation element of her medical negligence claim, Morales cites to the opinions of her two experts, Dr. Jose A. Spencer and Dr. Noah AR Nattell. Dr. Spencer is a licensed medical physician in Texas and New Mexico and is board certified in diagnostic radiology. (Dkt. 117-6). With respect to the sonogram taken on December 14, 2017 at the Tijuana medical clinic, Dr. Spencer briefly notes in his report the measurements of the gestational sac and the crown rump length, stating that "the sonographer has profiled an apparent embryo with a crown rump length of 0.23 cm." (*Id*. at 4). His report doesn't discuss whether the images reveal the existence of a fetal pole at this stage, nor does he mention a fetal heartbeat. And with little other analysis, he concludes that these "findings are consistent with early intrauterine gestation." (*Id*.). As to the sonogram taken from Morales's January 10, 2018 medical visit, Dr. Spencer notes that the sonogram reveals "a well formed intrauterine gestational sac containing a single embryo with a sonographic gestational age of approximately 6W0d +- 0W4D." (*Id*. at 1). He also states that "[n]o fetal heart tones are profiled suggesting embryonic demise in utero." (*Id*.).

Dr. Nattell is a board-certified Obstetrician and Gynecologist, and currently serves as a Director of Women's Health for Integrated Correctional Health Services in Los Angeles County's Department of Health Services while maintaining Voluntary Professorship at USC Keck School of Medicine in the department of Obstetrics and Gynecology. (Dkt. 117-7). Dr. Nattell opines in his

report on the correlation between early pregnancy loss and stress, adverse childhood experience, police violence, and maternal physical harm. (*Id*. at 3). For instance, he states that "there is little research on the effect of police violence as described by Ms. Morales-Alfaro on pregnancy outcomes, but maternal physical harm such as being shoved or kicked has undoubtedly resulted in poor obstetrical outcomes including spontaneous abortion, fetal demise, and preterm delivery." (*Id*.). He admits he did not view the images from Morales's December 14, 2017 ultrasound, and instead relied on the analysis from Dr. Spencer's report to conclude that the measurements in the medical visit report, combined with the disputed fact that Morales heard a fetal heartbeat during that visit, are all suggestive of a normally developing pregnancy. (*Id*. at 3–4). Focusing on the clinical course taken in Morales's circumstances, Dr. Nattell ultimately finds that, "[t]hough the overall pregnancy outcome may not have been altered had care been provided expeditiously, the patient would have endured less uncertainty and potentially less pain." (*Id*. at 6).

Notably absent from both of these two expert rebuttal reports is any opinion regarding whether the United States' medical negligence caused Morales's miscarriage. There is much discussion about the adequacy and timeliness of medical care provided to Morales during the duration of her custody, but none of it suggests whether a different clinical course would have altered the outcome of her pregnancy. *See White v. Roper*, 901 F.2d 1501, 1505 (9th Cir. 1990) (noting that conduct is an actual cause of injury "only if the injury would not have occurred 'but for' that conduct"). Similarly, while Morales disputes the United States' contention that her pregnancy had failed even before she was transferred to OMDC, she offers no expert testimony or evidence to actually rebut the testimony provided by the United States' expert. *See Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quotation omitted) (holding that it's not the task of the district court "to scour the record in search of a genuine issue of triable fact"); *Nelson v. Pima*

*Cmty. Coll.*, 83 F.3d 1075, 1081–82 (9th Cir. 1996) ("[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment."). Neither of Morales's experts rebut Dr. Kingston's conclusions about the absence of a fetal pole and yolk sac in the December 14, 2017 ultrasound. Although Dr. Nattell briefly suggests that the discrepancies in the gestational age may be attributed to an irregular menstrual cycle or inaccurate recollection of her last period, he provides no other explanation or analysis regarding how this affects the measurements reported in the medical visit report and the viability of the pregnancy at that stage. Expert opinions made with no factual basis are not enough to defeat summary judgment. *See Guidroz-Brault v. Mo. Pac. R. Co.*, 254 F.3d 825, 830–31 (9th Cir. 2001) (rejecting expert opinions on summary judgment where "there was no factual basis for the [expert's] assumption"). The Court finds that this failure to present the necessary evidence is itself dispositive. Having reviewed the record in detail, the Court finds no evidence to support Morales's claim regarding the United States.

Although the question of whether a defendant's conduct actually caused an injury is ordinarily left for the jury to decide, Morales hasn't presented specific facts that show there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 248 (1986) (noting "Rule 56(e)'s provision that a party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial'") (citation omitted) (alteration in original). Even if a triable issue exists as to whether Morales was afforded proper care, she fails to establish causation, an essential element of her claim. Because Morales has failed to meet her burden of showing the existence of a genuine dispute as to material fact, the Court **GRANTS** the United States' motion for summary judgment as to her fifth cause of action for medical negligence.

//

### C. Claims Against CoreCivic

The 4AC alleges four negligence-based causes of action against CoreCivic: negligence, negligent infliction of emotional distress, negligent supervision and training of employees, and respondeat superior liability. CoreCivic seeks summary judgment on all four of these claims on the grounds there is no evidence it breached its duty of care by maintaining unsuitable living conditions or failing to provide adequate medical care, and Morales hasn't established that CoreCivic's negligence was the cause of her miscarriage.

However, the Court has already granted summary judgment as to the only remaining federal claim in this case, and all that remains are Morales's four state-law claims. Because these claims are encompassed by this Court's supplemental jurisdiction, the Court may decline to exercise jurisdiction if it has dismissed all claims over which it has original jurisdiction. *See Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 561 (9th Cir. 2010) (citing 28 U.S.C. § 1367(c)(3)). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Id.* (citation omitted) (alterations in original). The Court finds this to be "the usual case," and accordingly declines to exercise supplemental jurisdiction and **DISMISSES** Morales's state law claims **WITHOUT PREJUDICE**.

//
//
//
//
//
//
//

## IV. CONCLUSION

The Court **GRANTS** the United States' motion for summary judgment as to Morales's fifth cause of action for medical negligence. (Dkt. 92). The Court declines to exercise supplemental jurisdiction over Morales's remaining state law claims and **DISMISSES** those claims **WITHOUT PREJUDICE** to refiling in state court. All remaining pending motions are **DENIED AS MOOT**. The Clerk is directed to enter judgment accordingly and terminate this case.

**IT IS SO ORDERED**.

Dated: February 24, 2023

Honorable Larry Alan Burns
United States District Judge