UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUBIA MABEL MORALES-ALFARO,<br><br>                                   Plaintiff,<br><br>v.<br><br>CORECIVIC, INC.; et al.,<br><br>                                   Defendants. | Case No.: 20-cv-82-LAB-BGS<br><br>**ORDER:**<br><br>**1) GRANTING CORECIVIC, INC.'S RULE 59(e) MOTION FOR RECONSIDERATION, [Dkt. 146]; and**<br><br>**2) GRANTING CORECIVIC, INC.'S MOTION FOR SUMMARY JUDGMENT, [Dkt. 95]** |

Plaintiff Rubia Mabel Morales-Alfaro ("Morales"), an asylum seeker from El Salvador, filed suit against Defendants CoreCivic, Inc. ("CoreCivic") and the United States for claims stemming from an alleged miscarriage she suffered on or about January 15, 2018, while in immigration custody. (Dkt. 50). The Court dismissed Morales's only federal claim against the United States and declined to exercise supplemental jurisdiction over Morales's remaining state law claims against CoreCivic. (Dkt. 139). CoreCivic now moves for reconsideration of the Court's prior order pursuant to Federal Rule of Civil Procedure 59(e) and asks the Court to consider its unresolved Motion for Summary Judgment. (Dkt. 146).

CoreCivic's Rule 59(e) motion argues the Court clearly erred when it

1   dismissed Morales's remaining state law claims because the Court had jurisdiction
2   to consider these claims under 28 U.S.C § 1332 once it dismissed the United
3   States. (*Id.* at 4–8). Morales doesn't dispute diversity existed as an independent
4   basis to retain subject matter jurisdiction over her state law claims. CoreCivic
5   therefore requests the Court consider the merits of its Motion for Summary
6   Judgment. (Dkt. 95). Having carefully read and considered all materials in support
7   of and in opposition to the respective motions, the Court rules as follows.

8   **I.    BACKGROUND**

9       Morales is a current resident of Fort Smith, Arkansas and a native and
10  citizen of El Salvador. (Dkt. 50 ¶¶ 5–6; 91 ¶ 3). In March 2017, she and her
11  husband left El Salvador to enter the United States. (Dkt. 91 ¶ 7). They arrived in
12  Tijuana, Mexico, in June of 2017 where they stayed and worked until
13  December 21, 2017. (*Id.* ¶ 8). Morales learned she was pregnant for a third time
14  while in Tijuana. (*Id.* ¶ 9). This pregnancy was confirmed on or about
15  December 13, 2017, by Dr. Sergio Mendez Ochoa at a medical clinic in Tijuana.
16  (*Id.* ¶ 12). Dr. Ochoa recommended Morales return to the clinic within four weeks
17  because she suffered a miscarriage eight months prior. (*Id.* ¶ 14). Except for
18  taking prenatal vitamins while in Tijuana, Morales didn't receive any additional
19  medical care before entering the United States. (*Id.* ¶ 15).

20      Morales, who believed she was eleven-weeks pregnant, unlawfully entered
21  the United States through a hole in the border wall between Tijuana and San
22  Diego on December 21, 2017. (*Id.* ¶ 16). Morales knew this journey would be
23  "risky" and that she would be arrested, but she thought she would be released
24  quickly after her arrest. (*Id.* ¶¶ 19–20). Morales was apprehended approximately
25  ten minutes after crossing the border. (*Id.* ¶ 21). When she was apprehended, she
26  was wearing a thin top, sweater, thin leggings, a hat, shoes, and socks despite
27  freezing cold temperatures. (*Id.* ¶ 18). She carried only a backpack containing
28  some personal items, but she didn't bring prenatal vitamins. (*Id.* ¶ 17). Morales

1  testified at her deposition that the Border Patrol Agent who apprehended her
2  kicked her "[o]n [her] hip" and "in the back." (Dkt. 117-8 at 57:7–25).

3      After she was apprehended, she was brought to a Border Patrol Station
4  where she remained for two days. (Dkt. 91 ¶ 22). Then, on December 24, 2017,
5  she was transferred to Otay Mesa Detention Center ("OMDC"), a minimum-
6  security detention facility. (*Id.* ¶¶ 23–24). OMDC is owned and operated by
7  CoreCivic pursuant to an agreement with the United States Immigration and
8  Customs Enforcement ("ICE"). (*Id.* ¶ 2). At OMDC, she stayed in dorm-style
9  housing in the Alpha Pod, which housed up to 128 low-custody female detainees.
10  (*Id.* ¶ 56). She was provided with three sets of clothing, shoes, outerwear,
11  bedding, blankets, linens, and a mattress, pillow, and hygiene kit. (*Id.* ¶ 63).
12  Detainees at OMDC had access to the facility's commissary where they could
13  purchase various items, including food. (*Id.* ¶ 68). Between December 28, 2017,
14  and January 4, 2018, Morales bought items including ramen noodles, M&M's,
15  Oreos, hot chocolate, oatmeal, and Pepsi. (*Id.* ¶ 69).

16      Because Morales believed she was pregnant, she was assigned to a bottom
17  bunk, (*id.* ¶ 58), and placed on a "pregnancy diet" that included extra food to meet
18  a required caloric intake, (*id.* ¶¶ 70–71). Detainees had access to medical, dental,
19  and mental health care provided by the ICE Health Services Corps at OMDC. (*Id.*
20  ¶¶ 73–74). Morales received medical care on December 28, 2017, January 10,
21  2018, and January 15, 2018. (*Id.* ¶¶ 106–108). On January 15, 2018, Morales was
22  transported offsite to the emergency room at Sharp Chula Vista for a suction
23  dilation and curettage procedure. (*Id.* ¶¶ 108–10). On January 16, 2018, Morales
24  passed a large blood clot, so her procedure was cancelled, and an ultrasound
25  confirmed she wasn't pregnant. (*Id.* ¶ 111).

26      On February 24, 2023, the Court determined Morales presented no genuine
27  issue of fact regarding the causation element of her medical negligence claim
28  against the United States under the Federal Tort Claims Act. (Dkt. 139). The Court

20-cv-82-LAB-BGS

concluded, as a matter of law, Morales failed to establish the United States's alleged negligence caused her miscarriage, and it granted the United States's motion for summary judgment. (*Id.*). The Court declined to exercise supplemental jurisdiction over Morales's state law negligence claims against CoreCivic. (*Id.*). CoreCivic timely filed a Rule 59(e) motion for post-judgment relief requesting the Court reconsider its February order and CoreCivic's unresolved Motion for Summary Judgment. (Dkt. 146).

## II.    RULE 59(e) MOTION FOR RECONSIDERATION

A Rule 59(e) motion for post judgment relief may be granted where the motion is necessary to correct clear errors of law upon which the judgment is based. *Turner v. Burlington N. Sante Fe R.R. Co.*, 338 F.3d 1058, 1063 (9th Cir. 2003). CoreCivic argues the Court's February 24, 2023, order declining to exercise supplemental jurisdiction was based on clear legal error because the Court had jurisdiction over Morales's state law claims under 28 U.S.C. § 1332 once the United States was dismissed. (Dkt. 146; 153 at 6).

District courts have a "virtually unflagging obligation to exercise the jurisdiction conferred upon [them] by the coordinate branches of government and duly invoked by litigants." *Williams v. Costco Wholesale Corp.*, 471 F.3d 975, 977 (9th Cir. 2006) (internal quotation marks omitted). District courts have original jurisdiction over civil actions where the amount in controversy exceeds $75,000 and the parties to the action are citizens of different states. 28 U.S.C. § 1332. Subject matter jurisdiction is determined as the facts existed at the time it was invoked. *Faysound Ltd. v. United Coconut Chems., Inc.*, 878 F.2d 290, 296 (9th Cir. 1989).

Morales's initial Complaint invoked the Court's subject matter jurisdiction based on federal question, 28 U.S.C. § 1331, and diversity, 28 U.S.C. § 1332. (Dkt. 1 ¶¶ 21–22). The Court decided diversity jurisdiction was lacking because the United States was a party. (Dkt. 3 at 2). Morales amended her Complaint and

claimed the Court could exercise jurisdiction over her federal claims against the United States pursuant to § 1331 and § 1346(a) and her claims against CoreCivic pursuant to § 1367(a). (Dkt. 50 ¶¶ 26–27). On February 24, 2023, the Court issued an order granting the United States motion for summary judgment and dismissing, sua sponte, Morales's state law claims against CoreCivic. (Dkt. 139). Supplemental jurisdiction over Morales's remaining claims against CoreCivic wasn't exercised because the Court found it dismissed all claims over which it had original jurisdiction. (*Id.*).

Once the Court dismissed the United States, the Court had an independent basis of jurisdiction over Morales's state law claims against CoreCivic pursuant to § 1332. Morales is a resident of Arkansas and an asylum seeker from El Salvador. (Dkt. 50 ¶¶ 5–6). CoreCivic is a Maryland corporation with its headquarters in Tennessee. (*Id.* ¶ 21). Although Morales's Fourth Amended Complaint ("4AC") is silent as to the actual damages she is requesting, she doesn't assert that the amount in controversy falls below the jurisdictional threshold. *See Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 87 (2014) ("[T]he defendant's amount-in-controversy allegation should be accepted when not contested by the plaintiff or questioned by the court."). In addition, Morales's initial Complaint, when she first invoked this Court's jurisdiction, sought damages well in excess of $75,000. (Dkt. 1 ¶ 22). Her operative 4AC requests compensatory and special damages "in an amount which will fairly and reasonably compensate her for the violation of her constitutional rights; her past and future medical care; [and] for her past and future pain and suffering and disability." (Dkt. 50 ¶ 205). Even if her failure to contest the amount wasn't determinative, the jurisdictional threshold is met because these requests can't be construed to a legal certainty to be below $75,000. *See Budget Rent-A-Car v. Higashiguchi*, 109 F.3d 1471, 1473 (9th Cir. 1997) (quoting *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938)) ("To justify dismissal, '[i]t must appear to a legal certainty that the claim is

really for less than the jurisdictional amount.'" (alteration in original)).

Here, granting CoreCivic's Rule 59(e) motion is necessary to correct a clear error of law on which the February order was based because once the United States was dismissed, the Court had jurisdiction over Morales's state law claims under § 1332 based on facts as they existed when the Court's jurisdiction was invoked. *See Faysound*, 878 F.2d at 296; c*f. Carmax Auto Superstores, Inc. v. Sibley*, No. 16cv611, 2016 WL 7493973, at *8 (E.D. Va. Dec. 30, 2016) ("[A] court could retain jurisdiction over a case removed for federal question jurisdiction even if the basis for federal question jurisdiction is destroyed . . . as long as an independent basis for subject matter jurisdiction (such as diversity jurisdiction) exists."). Morales doesn't dispute diversity existed as an independent basis of jurisdiction once the Court dismissed the United States. (*See* Dkt. 151, 152); *see also Morales-Alfaro v. CoreCivic, Inc.*, No. 23-cv-1311-LAB-BGS, ECF No. 1 (after Morales refiled her state law claims in state court, CoreCivic removed the case to federal court based on diversity jurisdiction, and Morales's didn't contest it). Instead, she argues CoreCivic's Rule 59(e) motion should be denied because neither the facts nor the law have changed since the order was issued. (Dkt. 152 at 3). Although these are alternative grounds to grant a Rule 59(e) motion, clear legal error is an independent basis to grant relief pursuant to Rule 59(e). *Turner*, 338 F.3d at 1063. Because the Court has a "virtually unflagging obligation to exercise the jurisdiction conferred upon [it] by the coordinate branches of government," the Court's failure to exercise diversity jurisdiction in the present matter was clear legal error. *See Williams*, 471 F.3d at 977 (alteration in original) (internal quotation marks omitted).

Alternatively, Morales argues CoreCivic's Rule 59(e) motion should be denied because CoreCivic didn't comply with Chambers Rule 3(e) or Local Rule 7(i). (Dkt. 151 at 2–3; 152 at 2). The Court finds this argument without merit. *See Thomasson v. GC Servs. Ltd. P'ship*, No. 05-cv-0940-LAB-CAB, 2007 WL

2317111, at *1 n.5 (S.D. Cal. Aug. 9, 2007) (citing *Hinton v. Pac. Enters.*, 5 F.3d 391, 395 (9th Cir. 1993)) ("[T]he court declines to construe local rules regarding motions for reconsideration to conflict with or to foreclose that relief [provided by Rule 59(e)].").

Dismissing Morales's state law claims against CoreCivic when the Court had subject matter jurisdiction over these claims was clear legal error. CoreCivic's Rule 59(e) motion is **GRANTED**.

## III.   SUMMARY JUDGMENT

### A.   Legal Standard

Summary judgment is appropriate under Federal Rule of Civil Procedure 56(a) where the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to prevail, the moving party must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant makes this showing, the burden shifts to the non-moving party to identify "specific facts showing there is a genuine issue for trial." *Id.* at 324. The party opposing summary judgment must present affirmative evidence from which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

In deciding a motion for summary judgment, the court draws all reasonable factual inferences in favor of the non-moving party. *Id.* at 255. "The mere existence of a scintilla of evidence in support of the plaintiff's position will not be sufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. The court doesn't make credibility determinations, weigh conflicting evidence, or draw legitimate inferences from the facts. *Id.* at 255. Rather, the court determines whether the record "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one

party must prevail as a matter of law." *Id.* at 251–52. In ruling on a motion for summary judgment, the court only needs to consider cited materials, but may consider other materials in the record. Fed. R. Civ. P. 56(c)(3). The court isn't obligated to scour the record. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).

## B.  Morales's Claims Against CoreCivic

Morales asserts four theories of liability against CoreCivic: (1) negligence, (2) negligent infliction of emotional distress, (3) negligent supervision and training of employees, and (4) respondeat superior liability. (Dkt. 50 at 40–44). Each theory will be addressed in turn.

### i.  Negligence

"Under California law, '[t]he elements of negligence are: (1) defendant's obligation to conform to a certain standard of conduct for the protection of others against unreasonable risks (duty); (2) failure to conform to that standard (breach of duty); (3) a reasonably close connection between the defendant's conduct and resulting injuries (proximate cause); and (4) actual loss (damages).'" *Corales v. Bennet*, 567 F.3d 554, 572 (9th Cir. 2009) (alteration in original) (quoting *McGarry v. Sax*, 158 Cal. App. 4th 983, 994 (2008)). CoreCivic argues it didn't breach its duty of care and, alternatively, even if it breached its duty of care, its breach wasn't a cause in fact of Morales's injury. (Dkt. 95 at 23–29; 129 at 7–9).

Under California law, whether a particular defendant owes a duty is a question of law "particularly amenable to resolution by summary judgment." *Regents of Univ. of Cal. v. Super. Ct.,* 4 Cal. 5th 607, 618 (2018) (quoting *Parsons v. Crown Disposal Co.,* 15 Cal. 4th 456, 465 (1997)). However, the issue of breach is a question of fact where "reasonable minds might differ as to whether the defendant's conduct has conformed to [that] standard." *Ramirez v. Plough, Inc.*, 6 Cal. 4th 539, 546 (1993).

Morales argues the scope of CoreCivic's duty of care is defined by its contract with ICE. (Dkt. 116 at 7–8). She alleges this contract required CoreCivic

to comply with ICE's Performance–Based National Detention Standards. (*Id.*). CoreCivic denies that its contract with ICE defines the scope of its duties to Morales, and instead argues that its duty was "to exercise ordinary care as a reasonably prudent person in providing reasonably safe conditions and access to medical care." (Dkt. 95 at 24–25). CoreCivic argues that under either standard, it didn't breach its duty to Morales. (*Id.*).

The Court declines to address the scope of CoreCivic's duty to Morales because it finds Morales failed to raise a genuine issue of material fact as to whether CoreCivic caused Morales's miscarriage. *See Celotex Corp.,* 477 U.S. at 323 ("[T]here can be 'no genuine issue as to any material fact,' [where] a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."). Morales hasn't raised a genuine issue of material fact as to whether CoreCivic's alleged breach of duty caused her miscarriage.

Under California law, "[t]he plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result." *Ortega v. Kmart Corp.*, 26 Cal. 4th 1200, 1205 (2001). "California has definitively adopted the substantial factor test of the Restatement Second of Torts for cause in fact determinations." *Rutherford v. Owens-Illinois, Inc.*, 16 Cal. 4th 953, 968–69 (1997) (citing *Mitchell v. Gonzales*, 54 Cal. 3d 1041, 1052 (1991)). The "substantial factor" test subsumes the "but for" test. *Mitchell*, 54 Cal. 3d at 1052. If the defendant's alleged conduct had nothing to do with the plaintiff's injures, it can't be said the conduct was a substantial factor in causing the plaintiff's injuries. *Id.* In a California personal injury action, the plaintiff must prove causation "within a reasonable medical probability based upon competent expert testimony." *Kline v. Zimmer, Inc.*, 79 Cal. App. 5th 123, 129 (2022) (quoting *Jones v. Ortho Pharm. Corp.*, 163 Cal. App. 3d 396, 402 (1985)).

Morales argues her negligence claim against CoreCivic depends on different elements than her professional negligence claim against the United States that the Court dismissed for failure to show causation. (Dkt. 152 at 4–5). Specifically, she relies on *Powell v. Kleinman*, 151 Cal. App. 4th 112, 123 (2007), for the proposition that, unlike in the professional negligence context, she isn't required to present expert testimony regarding causation in a general negligence action. (*Id.* at 5). *Powell* holds that a plaintiff pursuing a medical negligence claim must present expert testimony regarding the causation element. *Powell*, 151 Cal. App. 4th at 123. It doesn't support Morales's contention that expert testimony isn't required to prove causation in a general negligence action. *Cf. Jones*, 163 Cal. App. 3d at 402 ("The law is well settled that in a personal injury action causation must be proven within a reasonable medical probability based upon competent expert testimony.").

CoreCivic relies on the expert opinion of Dr. Jessica M. Kingston. Dr. Kingston is board-certified by the American Board of Obstetrics and Gynecology and is currently employed at the University of California San Diego as a Health Sciences Clinical Professor. (Dkt. 92-2 ¶¶ 6–8). According to her expert testimony, ultrasounds documenting a pregnancy will show the gestational sac by the fourth week of gestation, the yolk sac by the fifth week, the fetal pole by the sixth week, and fetal heart motion as early as the sixth week but almost always by the seventh week. (*Id.* ¶ 40). Based on the timing of Morales's last menstrual period, Dr. Kingston concluded Morales was six weeks and three days pregnant during her December 14 visit to the Tijuana clinic. (*Id.* ¶ 44). However, the ultrasound images produced by Dr. Ochoa during this visit show the measurements of Morales's intrauterine gestational sac were between eight and thirteen millimeters, which only indicated a four-week pregnancy. (*Id.* ¶ 42). Dr. Kingston's report concluded this discrepancy was indicative of early pregnancy loss. (*Id.* ¶¶ 43, 45).

Dr. Kingston stated Dr. Ochoa's report from the Tijuana clinic makes no mention of a fetal heartbeat. (*Id.* ¶¶ 46–47). She stated "[i]f the pregnancy was only measuring 4 weeks, no fetal heartbeat could possibly have been detected. . . . [I]f her pregnancy had developed normally, by 6 weeks 3 days there should have been a fetal heartbeat present, but there was not." (*Id.* ¶ 48). Moreover, she noted that although Dr. Ochoa's report described a two-millimeter fetal pole, it wasn't actually visible in the ultrasound images. (*Id.* ¶ 42). She confirmed this finding because Dr. Ochoa's report didn't note the existence of a yolk sac, "which would have developed before the fetal pole in a normal pregnancy." (*Id.* ¶ 51).

Dr. Kingston mentioned that "[o]n December 14, 2017, Ms. Morales-Alfaro's pregnancy should have measured at approximately 6 weeks, 3 days. Not only did she measure at only 4 weeks, but the ultrasound didn't show an embryo, which is suspicious for impending pregnancy loss." (*Id.* ¶ 53). Considering the discrepancy as to Morales's gestational age, Dr. Kingston stated that "Ms. Morales-Alfaro's clinical course and ultrasound studies demonstrate that the ultrasound performed on December 14, 2017 was indicative of early pregnancy failure and this was definitively confirmed when her second ultrasound was performed 4 weeks later on January 10, 2018." (*Id.* ¶ 59). She concluded "to a reasonable degree of medical probability that Ms. Morales-Alfaro's estimated [last menstrual period], clinical course, symptom timeline, and ultrasound studies are evidence that she was experiencing pregnancy failure prior to being apprehended by US Border Patrol agents on December 22, 2017," (*id.* ¶ 61), and that nothing could've been done to prevent her pregnancy loss, (*id.* ¶ 88).

Morales's experts fail to rebut Dr. Kingston's opinion that her lost pregnancy occurred before she was apprehended by US Border Patrol agents. Plaintiff relies on the testimony of two experts, Dr. Jose A. Spencer and Dr. Noah AR Nattell.

Dr. Spencer is a licensed physician in Texas and New Mexico and is board-certified in diagnostic radiology. (Dkt. 117-6 at 4). He reviewed Dr. Ochoa's

20-cv-82-LAB-BGS

December 14, 2017, sonogram and his report notes "an apparent embryo with a crown rump length of .23 cm." (*Id.*). His report doesn't discuss whether the images reveal the existence of a fetal pole, a yolk sac, or a fetal heartbeat. Without further analysis, Dr. Spencer concludes his findings "are consistent with early intrauterine gestation." (*Id.*). Dr. Spencer also reviewed Morales's sonogram from January 10, 2018. (*Id.* at 1). He noted the "sonographic gestational age is approximately 6W0d +- 0W4D." (*Id.*). He concluded that no fetal "heart tones [were] profiled suggesting embryonic demise in utero." (*Id.*). Neither report discusses whether the images reveal the existence of a fetal pole or a yolk sac, the lack of which, according to Dr. Kingston, shows Morales miscarried prior to her detention at OMDC. (Dkt. 92-2 ¶ 61). Thus, Dr. Spencer's report falls short of raising a genuine issue of fact as to whether Morales miscarried prior to her detention at CoreCivic's facility.

Dr. Nattell is a board-certified Obstetrician and Gynecologist, director of Women's Health for Integrated Correctional Health Services in Los Angeles County's Department of Health Services, and volunteer professor at USC Keck School of Medicine. (Dkt. 117-7 at 1). The bulk of Dr. Nattell's report deals with the standard of care Morales received while at OMDC. (*Id.* at 3–5). Dr. Nattell reviewed neither Morales's December 14, 2017, ultrasound nor Dr. Ochoa's report from her visit to the Tijuana clinic. (*Id.* at 2). Instead, he relies exclusively on Dr. Spencer's report to conclude "there is no indication that the images described in this report represent a non-viable pregnancy." (*Id.* at 3). Expert opinions made with no factual basis aren't enough to defeat summary judgment. *See Guidroz-Brault v. Mo. Pac. R.R. Co.*, 254 F.3d 825, 830 (9th Cir. 2001) (rejecting expert opinions on summary judgment where "there was no factual basis for the [expert's] assumption"). Dr. Nattell's bare conclusion that the ultrasounds he didn't review are consistent with a viable pregnancy can't defeat summary judgment. *United States v. Various Slot Machs. on Guam*, 658 F.2d 697, 700 (9th Cir. 1981) ("[I]n the context of a motion for summary judgment, an expert must back up his opinion

with specific facts."). As discussed, Dr. Spencer's report failed to identify the existence of a fetal pole or yolk sac in Morales's ultrasound from the Tijuana clinic. CoreCivic's expert testified that this deficiency shows that Morales miscarried prior to her detention at OMDC. (Dkt. 92-2 ¶ 61). Dr. Nattell's exclusive reliance on a report that falls short of showing causation to a reasonable degree of medical probability can't possibly create an issue of fact concerning causation. *See Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081–82 (9th Cir. 1996) ("[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment.").

Even if the portion of Dr. Nattell's report concerning the viability of Morales's pregnancy isn't deficient for failing to examine Dr. Ochoa's ultrasounds directly, the report fails to establish causation to a reasonable degree of medical probability. Here, Dr. Nattell conceded that had Morales received more expeditious care, "the overall pregnancy outcome may not have been altered." (Dkt. 117-7 at 5). The report plainly falls short of showing causation to a reasonable medical probability. *Jones*, 163 Cal. App. 3d at 403 ("A possible cause only becomes 'probable' when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of its action. This is the outer limit of inference upon which an issue may be submitted to the jury.").

As to Morales's argument that she failed to obtain obstetric care and that she was confined to unconstitutionally punitive conditions that contributed to her miscarriage, these claims also fail. (Dkt. 116 at 17). As analyzed above, Morales failed to refute Dr. Kingston's expert opinion that she wasn't already suffering a miscarriage prior to her detention at OMDC. She also fails to provide any evidence that she wasn't provided with obstetric care or that she was living in unconstitutionally punitive conditions. (*See* Dkt. 129 at 2–6). The undisputed facts mention Morales was assigned to the bottom bunk, (Dkt. 91 ¶ 58); free to travel around OMDC, (*id.* ¶ 60); provided thee sets of clothing, shoes, outerwear,

20-cv-82-LAB-BGS

bedding, blankets, linens, and a mattress, pillow, and hygiene kit, (*id.* ¶ 63); had access to feminine hygiene products, (*id.* ¶ 64); and could make purchases from the facility's commissary and received additional food, (*id.* ¶¶ 68–72). More importantly, each time Morales needed medical care, she received it. (*Id.* ¶¶ 105–109). There's no record that Morales submitted a complaint about the temperature, requested additional blankets or clothing, requested assistance, or filed a grievance to CoreCivic's staff. (*Id.* ¶¶ 67, 103). Aside from Morales's assertion that she "begged for prenatal care for nearly two weeks," she doesn't provide any evidence of how she wasn't provided proper care during her detention when the evidence shows she received medical care on three separate occasions. (*See* Dkt. 116 at 20–23). Even if these alleged circumstances were true, Dr. Kingston found these circumstances had no effect on her pregnancy. (Dkt. 92-2 ¶¶ 75–89).

Morales presented no expert testimony rebutting Dr. Kingston's conclusion that, to a reasonable degree of medical certainty, Morales's miscarriage began before she was apprehended by US Border Patrol and brought to OMDC. *Cf. Kline*, 79 Cal. App. 5th at 131 ("To allow a jury to consider a claim where the plaintiff's prima facie showing falls short of reasonable medical probability would be to allow the jury to find the requisite degree of certainty where science cannot."). Morales failed to establish a genuine issue of material fact regarding an essential element of her negligence claim against CoreCivic, and this claim fails as a matter of law. *See Celotex Corp.,* 477 U.S. at 323.

### ii.   Negligent Infliction of Emotional Distress

Under California law, negligent infliction of emotional distress isn't an independent tort, but rather derives from the tort of negligence. *Marlene F. v. Affiliated Psychiatric Med. Clinic, Inc.*, 48 Cal. 3d 583, 588 (1989). "It is settled in California that in ordinary negligence actions for physical injury, recovery for emotional distress caused by that injury is available as an item of parasitic

20-cv-82-LAB-BGS

damages." *Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th. 965, 981 (1993) (citing *Crisci v. Sec. Ins. Co.*, 66 Cal. 2d 425, 433 (1967)).

Morales argues that even if she can't show CoreCivic caused her miscarriage, its negligence caused her to suffer for twelve days while her miscarriage symptoms worsened. (Dkt. 116 at 23). This allegation of harm is distinct from that alleged in her 4AC. (*See* Dkt. 50 ¶¶ 184–187). In her 4AC, Morales alleges her suffering was caused by her lost pregnancy. (*Id.* ¶ 186). The allegation in her 4AC is consistent with her deposition testimony where she was asked "is it the loss of your baby that has caused you all of your trauma?" to which she replied "yes." (Dkt. 117-8 at 146:5–7). If Morales intended to introduce a new basis for her negligent infliction of emotional distress claim, the Court declines to consider this new basis of liability at the summary judgment stage. *See Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) (citation omitted) ("[T]he necessary factual averments are required with respect to each material element of the underlying legal theory. . . . Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings." (alteration in original)). Because her claim for negligence fails, Morales's request for parasitic damages under a theory of negligent infliction of emotional distress also fails. *See Crisci*, 66 Cal. 2d at 433 ("[M]ental suffering constitutes an aggravation of damages when it naturally ensues from the act complained of . . . ."); *see also Desmond v. Charter Commc'ns, Inc.*, No. 19-cv-2392-AJB-MDD, 2021 WL 3034021, at *12 (S.D. Cal. July 19, 2021) (granting summary judgment to defendant on negligent infliction of emotion distress claim because plaintiff failed to show she can prevail on underlying discrimination, retaliation, and harassment claims).

### iii.    Negligent Training and Supervision

Under California law, a plaintiff alleging negligent training or supervision must show "the employer negligently trained the employee as to the performance

of the employee's job duties and as a result of such negligent instruction, the employee while carrying out his job duties caused injury or damage to the plaintiff." *Garcia ex rel. Marin v. Clovis Unified Sch. Dist.*, 627 F. Supp. 2d 1187, 1208 (E.D. Cal. 2009) (citing *State Farm & Casualty Co. v. Keenan*, 171 Cal. App. 3d 1, 23 (1985)). To prevail, the plaintiff must show the employer "knew or should have known that an employee's unfitness or incompetence created a particular risk of harm and that harm materialized, causing the plaintiff's injury." *Castrellon v. Costco Wholesale Corp.*, No. CV 20-3295-DMG (ASx), 2021 WL 4228353, at *4 (C.D. Cal. June 17, 2021) (citing *Delfino v. Agilent Techs., Inc.*, 145 Cal. App. 4th 790, 815 (2006)).

Morales argues a dispute of fact exists as to whether CoreCivic's employees were sufficiently trained in their duties to provide adequate medical care to detainees and whether CoreCivic's employees breached these duties by failing to provide medical care outside of "emergencies." (Dkt. 116 at 24). She argues CoreCivic inadequately trained its staff to understand a situation requiring a medical emergency. (*Id.* at 26). Because of this inadequate training, Morales argues she suffered a miscarriage, which was the foreseeable result of ineffective training. (*Id.* at 27). This argument fails for three reasons.

First, the parties' joint statement of undisputed facts recognizes that CoreCivic's personnel were trained regarding First Aid & Medical Referral, pregnancy issues, and medical emergencies, and that this training was appropriate and within industry standards. (Dkt. 91 ¶¶ 31–45). Because Morales conceded that CoreCivic didn't breach its duty to adequately train its employees, this claim fails as a matter of law.

Second, even if the Court disregards Morales's prior concession, she failed to identify a specific CoreCivic employee who was negligently trained. Because Morales hasn't shown CoreCivic knew or had reason to know a particular employee created a risk or hazard, this claim fails as a matter of law. *See Delfino*,

145 Cal. App. 4th at 817.

Finally, assuming neither Morales's concession nor her failure to identify a particular employee are determinative, her claim fails because she can't prove all elements for negligence. As discussed, Morales failed to present expert testimony concluding to a reasonable degree of medical probability that any employee caused her miscarriage. Because she can't show any of CoreCivic's employees caused her miscarriage, this claim fails as a matter of law.

### iv.      Respondeat Superior Liability

Morales's claim for respondeat superior liability against CoreCivic is facially the same as her claim for negligent training and supervision. The substantive difference is that under this theory of liability, the plaintiff isn't required to show her injuries were the result of the defendant's negligent training. *See, e.g., Perez v. Van Groningen & Sons, Inc.*, 41 Cal. 3d 962, 967 (1986). Instead, an "employer is vicariously liable for his employee's torts committed within the scope of the employment." *Id.* Thus, Morales's concession that CoreCivic's training was appropriate and within industry standards isn't determinative to CoreCivic's liability under the doctrine of respondeat superior. (Dkt. 91 ¶ 45).

However, under California law, "unless the employee is identified, the trier of fact will not be able to determine if the elements needed to assert vicarious liability have been proved." *Munoz v. City of Union City*, 120 Cal. App. 4th 1077, 1113 (2004), *overruled on other grounds by Hayes v. Cnty. of San Diego*, 57 Cal. 4th 662, 639 n.1 (2013). The allegedly "negligent employee whose conduct is sought to be attributed to the employer [must] at least be specifically identified, if not joined as a defendant." *Id.*

Here, Morales's doesn't identify a specific employee of CoreCivic whose alleged negligence caused her miscarriage. (*See* Dkt. 116). It isn't the task of the Court to "scour the record in search of a genuine issue of triable fact." *Keenan*, 91 F.3d at 1279; *see also Shakur v. Schriro*, 514 F.3d 878, 892 (9th Cir. 2008) (citing

*Jenkins v. Cnty. of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005)) (determining a plaintiff has abandoned claims that weren't raised in opposition to the defendant's motion for summary judgment). Moreover, even assuming Morales's failure to identify a particular employee of CoreCivic isn't determinative, she didn't produce expert testimony rebutting Dr. Kingston's conclusion that, to a reasonable degree of medical probability, her miscarriage began before she entered CoreCivic's OMDC facility. Morales's derivative claim for respondeat superior liability against CoreCivic fails as a matter of law.

## IV.    CONCLUSION

The Court **GRANTS** (1) CoreCivic's Rule 59(e) Motion for Reconsideration, (Dkt. 146), and (2) CoreCivic's Motion for Summary Judgment as to Morales's remaining causes of action, (Dkt. 95). The Clerk is directed to enter judgment accordingly and terminate this case.

**IT IS SO ORDERED**.

Dated:  March 12, 2024

_____
Honorable Larry Alan Burns
United States District Judge